**UNITED STATES, Appellee,**

v.

**Walter H. DOLLENTE, Staff Sergeant U.S. Air Force, Appellant.**

No. 95–0986.
Crim.App. No. 30601.

U.S. Court of Appeals for
the Armed Forces.

Argued Feb. 29, 1996.

Decided Sept. 30, 1996.

For Appellant: *Captain Harold M. Vaught* (argued); *Colonel Jay L. Cohen* (on brief).

For Appellee: *Major LeEllen Coacher* (argued); *Lieutenant Colonel Michael J. Breslin* (on brief); *Colonel Jeffery T. Infelise*.

*Amicus Curiae* urging reversal: *Kenneth Olivo*, Law Student (argued); *Michael F. Noone, Jr.* and *John Winkler* (law student) (on brief)—For Catholic University of America Columbus School of Law, Military Law Students Association.

*Amicus Curiae* urging affirmance: *Charniele LeRhond Herring*, Law Student (argued); *Michael F. Noone, Jr.* (on brief)—For Catholic University of America Columbus School of Law, Military Law Students Association.

### Opinion of the Court

SULLIVAN, Judge:

Appellant was tried by a general court-martial composed of members at Aviano Air Base, Italy, in February of 1993. Contrary to his pleas, he was found guilty of committing indecent acts (2 specifications) and taking indecent liberties with the same female under the age of 16, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. He was sentenced to a bad-conduct discharge; confinement for 4 years, and reduction to pay grade E–1. The convening authority approved the sentence as adjudged on June 2, 1993. In an unpublished opinion, the court below affirmed on May 31, 1995, after modifying the findings and reassessing the sentence.

On December 13, 1995, this Court granted review of the following issues: [1]

### I

WHETHER THE MILITARY JUDGE ABUSED HIS DISCRETION IN GRANTING THE PROSECUTION'S MOTION IN LIMINE TO EXCLUDE THE EXPERT TESTIMONY OF CAPTAIN (CHAPLAIN) FRANCIS XAVIER MCGERITY ON THE BASIS THAT HE WAS NOT QUALIFIED TO RENDER AN EXPERT OPINION, WHICH WAS TO THE SUBSTANTIAL PREJUDICE OF APPELLANT.

### II

WHETHER IT WAS PREJUDICIAL ERROR TO PERMIT THE PROSECUTION'S EXPERT WITNESS TO PRESENT TESTIMONY THAT PSYCHOLOGICAL TESTING OF [LGG] INDICATED SHE WAS NOT LYING.

---

1. We heard oral argument in this case at the Catholic University of America Columbus School of Law, Washington, D.C., on February 29, 1996, without objection from the parties involved as part of the Court's "Project Outreach." *See United States v. Youngberg*, 43 MJ 379, 381 n. 2 (1995).

## III

## WHETHER IT WAS PLAIN ERROR TO PERMIT THE PROSECUTION TO ADMIT EXPERT TESTIMONY CONCERNING THE "BASIC PROFILE OF A PERPETRATOR."

We hold that, although individually each error in this case does not warrant reversal, the "combined effect of these ... errors was so prejudicial so as to strike at the fundamental fairness of the trial." *United States v. Parker*, 997 F.2d 219, 222 (6th Cir.1993). In sum, the "cumulative effect of these errors denied appellant a fair trial." *United States v. Banks*, 36 MJ 150, 152 (CMA 1992).

The Court of Criminal Appeals delineated the facts giving rise to this appeal of appellant's conviction of committing indecent acts and taking indecent liberties with his 13–year–old step-daughter. It said:

LGG's credibility was the critical issue in this hotly contested case. LGG, appellant's 13–year–old step-daughter, made the allegations after a fight with her parents concerning ongoing disciplinary problems. Following the report, she was placed in foster care and remained there throughout the trial.

About one week before trial, LGG signed a statement indicating: "I just wanted to make a statement that all I said never happened. I just said those things because I was mad ... After all I said, my mom is still on my stepdad's side, so I decided to stop it all because I didn't want to be alone ... My mom always told me how I should thank God for my stepdad because my real dad never cared."

Following this statement, the government scheduled a meeting with all parties to correct some misperceptions; namely, that LGG and her sister would not be placed in foster care and her mother would not go to jail. It is unclear how LGG developed these ideas or the impact, if any, they may have had on her initial decision to withdraw her allegations.

In any event, LGG testified at trial "because it's true" and she did not believe she had a choice. She affirmed her initial allegations and explained her temporary retraction stating: "Because I didn't want to have to go in here and say everything all over again. I thought it would be easier to just say I was lying." There was contradictory evidence as to whether family members pressured LGG to change her story.

Both LGG's mother and sister testified for the defense, contradicting various aspects of LGG's testimony. LGG's diary, which contained no mention of sexual abuse but described her hatred of appellant, was also admitted into evidence. Appellant denied sexually abusing LGG. However, he testified that she may have misinterpreted his hugging her and sometimes he "goes on top of her to wake her up." He explained that he would lay on the bed beside her and in reaching across her, part of his body would go on top of hers while he was trying to wake her. He denied ever being fully on top of her. An Air Force Office of Special Investigations (AFOSI) agent testified that during appellant's interview he admitted he may have accidentally touched LGG's breasts while he was hugging her.

\* \* \*

Trial defense counsel initially offered Chaplain M as an expert on the symptoms and evaluation of post-traumatic stress syndrome to aid the members in understanding the medical problems of the victim. Later, he supplemented this offer stating that Chaplain M will provide "the basis for his diagnosis in this case of the victim suffering from a post-traumatic stress syndrome...."

During an Article 39(a) session, Chaplain M described himself as a therapist, detailing his undergraduate degree in Psychology, Master's degree in Education, Counseling, and Human Services, and his 15 years of counseling experience. He stated that he was not a qualified diagnostician in the Air Force but previously made diagnoses which were reviewed and approved by others. He further said that he had not examined LGG but was relying on his review of the evidence, her diary, and Dr. D's, a psychologist who examined LGG, diagnosis

of post-traumatic stress syndrome. He stated that the term "R/O" in Dr. D's report meant a confirmed diagnosis. Chaplain M also indicated that he counseled appellant and his wife and that he did not believe appellant committed the offenses.

The government's expert, Capt (Dr.) R, contradicted Chaplain M's interpretation of the term "R/O", stating that it meant "rule out" as opposed to confirming a diagnosis. The prosecutor challenged M's qualifications and offered to bring in another witness, such as Dr. D, to testify.

The military judge excluded Chaplain M's testimony holding that an "insufficient basis has been shown to qualify [Chaplain M] ... to testify as to his opinion or psychological diagnosis concerning [the victim]." Appellant alleged this was error because Chaplain M qualified as an expert based on his training and experience.

\* \* \*

Before Captain R, the government's expert witness, testified, the defense moved to exclude any testimony which commented on the victim's truthfulness. All parties agreed to limit the doctor's testimony and the military judge cautioned Capt R to avoid expressing an opinion as to the credibility of the victim or any other witness in this case.

Capt R subsequently testified that he conducted a mental-status examination of LGG which consisted of an interview and psychological testing. He indicated that during this evaluation, he was looking for "any type of self-centered, manipulative, vindictive, or any other pathological personality characteristic, and none were revealed in the interview or testing." Capt R later testified that false reports of sexual abuse are discovered by reviewing inconsistencies in statements and detecting self-centered and manipulative personality characteristics.

There was no objection to this testimony at trial. In fact, during the Article 39(a) out of court session discussing the proposed testimony, the military judge asked counsel about the admissibility of the traits

of "vindictiveness, manipulative style, or self-centeredness." Trial defense counsel stated: "if he's limited to that, that's fine, I agree." Later, counsel stated, "my position is I have no problem with extracting her traits and telling the court about that." Rather, he indicated his problem was with extracting her traits and telling the court she would not fabricate official reports.

\* \* \*

Trial counsel also asked Capt R to "talk a little bit about the people who commit these type of offenses." Capt R described an abuser as an individual, usually a father or stepfather, who has a need for power and control, and who is frequently upstanding, law-abiding, church-going, and a hard worker. There was no objection to this testimony.

Unpub. op. at 2–6, 1995 WL 337083.

The Court of Criminal Appeals held that, while error occurred in excluding the testimony of Chaplin McGerity, such error was harmless. It further concluded that there was no plain error in admitting of the testimony of Captain Revis.

— — —

Our starting point in resolving this case is the decision of the Court of Criminal Appeals. That court found that three evidentiary errors occurred in this case. First, it held that the military judge erred in refusing to admit expert testimony from a defense witness (Chaplain McGerity) concerning the alleged victim's post-traumatic stress disorder. Unpub. op. at 4, 1995 WL 337083. Second, in employing a waiver analysis, it held that the military judge erred in admitting prosecution expert testimony (Captain Revis) which supported the victim's credibility. *Id.* at 5. Third, by utilizing a plain-error analysis, it held that the military judge also erred in admitting perpetrator-profile evidence from Captain Revis. *Id.* at 6.

The critical issue before this Court, however, is whether these evidentiary errors, individually · or together, so prejudiced appellant as to require a rehearing. *See Banks*, 36 MJ at 170–71. In this regard, we note that the Court of Crimi-

nal Appeals described this as a "hotly" contested case of child sexual abuse involving a recantation by the alleged victim prior to trial. Moreover, the trial itself was conceded by all parties to be essentially a swearing contest between the alleged victim and appellant. In this context, even a single evidentiary error of sufficient impact might compel a rehearing. *See United States v. Gray*, 40 MJ 77, 81 (CMA 1994).

■ The first evidentiary error committed at this trial concerned the military judge's refusal to permit Chaplain McGerity to testify as a defense expert concerning the victim's psychological state. It was his professional opinion as a "psychotherapist counselor" that the alleged victim suffered from "post-traumatic stress disorder" and "manic depression." We agree with the appellate court below that Chaplain McGerity was qualified based on the record in this case to provide such testimony as an expert on the symptoms and evaluation of post-traumatic stress syndrome. *See United States v. Mustafa*, 22 MJ 165, 168 (CMA 1986) (person with professional training and some experience that could be of help to court members).

■ The remaining question, of course, is how would testimony from such an expert witness have helped appellant. At first blush, the fact that the alleged victim suffered from post-traumatic stress syndrome and manic depression would not seem to favor the defense. However, it is clearly implied in the record that this witness would also have testified that this particular mental state may be caused by traumas other than sexual assault and that such a possibility existed in this case.[2] Such testimony would have contradicted the prosecution's expert's testimony that there was no indication of any other traumatic causes for her agitated mental state other than her sexual assault by her stepfather. Accordingly, such testimony could have negated a part of the Government's case.

The second evidentiary ruling of concern is the one allowing testimony from the government expert witness, Captain Revis, to the effect that the alleged victim was credible. There was an earlier defense objection to this witness' providing credibility testimony, agreement between the judge and trial counsel on this prohibition, and express warning of the witness on this matter. Trial counsel,

2. The Court of Criminal Appeals stated that, "[w]hile the defense did not elaborate on the relevance of Chaplain M's testimony concerning post-traumatic stress syndrome, we believe the evidence of her behavioral problems was adequately presented to members." Unpub. op. at 4. This statement misconstrues the defense proffer.

Civilian defense counsel explained the importance of Chaplain McGerity's testimony as follows:

ARGUMENT BY INDIVIDUAL DEFENSE COUNSEL ON PROFFERED EXPERT WITNESS

IDC: Your Honor, so there is no misunderstanding with the court, I think the value of Captain McGerity is that what he's going to do is to take the evidence presented to him that deals with this case regarding [LGG], and he's going to show and articulate that evidence which ties in with the symptoms for the post-traumatic stress disorder, and he certainly can do that, and he's done it. He's done it with a great deal of. study in this case, articulation, and paramount to the issue before the court on the charges, the guilt or innocence of Sergeant Dollente. *If the court has enough information as to what the post-stress syndrome is and the*

*symptoms for it and then they are shown the symptoms in this case, certainly the court can draw their own conclusion as to what weight to give it in terms of how it impacts on the guilt or innocence of Sergeant Dollente.*
MJ: Inferentially by how it would impact on the credibility or believability of the witness' testimony? Is that what you're getting at?
IDC: Yes, exactly. Exactly.
(Emphasis added.) In later attempting to make this same argument without the benefit of the defense expert's testimony to support it, counsel stated:

Adjustment disorder. That's the diagnosis. How about having to be on pins and needles to come to a trial that obviously she doesn't want to come to? How about that event causing an adjustment disorder? But if you want to go back further, how about being, as she put it, yanked out of the Philippines; her mother not being with her; she doesn't have a father; she gets in a home with a stepfather she can't stand; she hates him; the lifestyle she doesn't like in the home; it's a new culture; it just gets worse; the interference with her boyfriends; and so on and so forth. This girl is an emotional yo-yo. Look at the diary. How about that resulting in an adjustment disorder?

nonetheless, conducted the following examination of this witness:

Q. Okay. Has it been your experience that adolescents who have feelings or concern with pleasing and gaining approval of others, *that they use allegations of sexual abuse to gain that?*

A. Usually not.

Q. Okay. Any other type—what else did you look for or rule out as far as personality?

A. As far as personality, I was looking for any signs of vindictiveness. You know, is this a kid who would do anything to get back at somebody, if they were mad at them?

Q. Are you trained to look for that? Is this test—

A. Oh, sure, yeah. We're trained to analyze all components of a personality, and that's clearly a personality characteristic.

Q. Okay.

A. Another thing I was looking for was manipulativeness, and that would show up on what we call the validity scales on the test. *Is this person lying, are they exaggerating?*

Q. *On the test?*

A. *On the test, yeah, and the test specifically has what we could call trick questions to see if someone is lying or trying to skew the results in one way,* and there was no evidence of manipulativeness or anything like that either. I was also looking for things like is there a problem with her style of thinking? *Is she the type of person who would deliberately misconstrue or deliberately exaggerate things? and the testing or the interview showed no signs of that, but basically I was looking for,* you know, any type of self-centered, manipulative, vindictive or any other pathological personality characteristic, and *none were revealed in the interview or the testing.*

(Emphasis added.)

 Such testimony effectively placed the expert's favorable opinion of the victim's credibility before the members[3] and provid-

---

**3.** In addition, the record later reflected Doctor Revis' testimony regarding the victim's truthfulness in her complaint against appellant, stating:

> MJ: Okay. With respect to the question, I've decided to recast it slightly. Your question dealt with the experience of the witness in his practice. I'm going to recast it in terms of his familiarity with the literature in his field. Other than that, the question will be essentially the same.
>
> So, Dr. Revis, *is there literature in the field dealing with adolescents that in fact apparently were not abused but made up an allegation for a motive of their own such as, for example to get back at a parent?*
>
> WIT: *Yes, sir.*
>
> MJ: Okay. In those cases, were there indications as to how the author or clinician arrived at that conclusion? In other words, on what basis they arrived at that conclusion?
>
> WIT: *That conclusion was based on inconsistencies in their allegations, in supporting facts and the discovery of certain personality characteristics that were consistent with someone who would be self-centered and manipulative and generally disregard the rights and feelings of others.*
>
> MJ: Okay. Are there other questions by the court members?
>
> Okay. Apparently not.
>
> Questions by counsel for either side in view of that question?

> REDIRECT EXAMINATION BY THE TRIAL COUNSEL:
> Q. *Those categories you just listed, those were some of the things you mentioned earlier you tested for in [LGG] and found negative?*
> A. *That's correct.*
> TC: *Thank you.*
> MJ: Mr. Bellen?
> CROSS–EXAMINATION BY THE INDIVIDUAL DEFENSE COUNSEL:
> Q. I can't resist this, captain—excuse me—but are you telling this court that people who come up positive or negative on manipulation and vindictiveness are not manipulative and vindictive?
> A. It's a matter of degree, I guess.
> IDC: Uh-huh. Okay. Thank you.

(Emphasis added.) Trial counsel finally directly exploited all this testimony in his closing argument on findings, as follows:

> There are cases, the doctor told you, when a child makes false allegations for whatever reason to get back at the parents, *but he also told you that there are ways of finding out, at least in most cases in the studies he talked about and the research, that those were false allegations, and he also told you that he took those steps in this particular case and he saw no evidence in his testing, in his evaluation, in his review of the evidence, that would indicate that [LGG] got up on the stand and deliberately, maliciously, vindictively manipulated this court panel in any way, shape, form of fashion,* but you've got

# 240

ed support to the prosecution's case. *See United States v. Suarez*, 35 MJ 374, 376 (CMA 1992). The Court of Criminal Appeals nonetheless concluded that appellant's failure to object during trial to this testimony constituted waiver even though a motion *in limine* had been made by the defense. Accordingly, it did not even consider the question of prejudice flowing from this error. We disagree.

 An accused cannot always rely on a motion *in limine* to preserve an issue for appellate review absent further objection. *See United States v. Johnson*, 35 MJ 17, 21 (CMA 1992). "'[M]otions *in limine* [often] address hypothetical concerns that may not arise during the course of trial [; thus] parties must re-raise objections with particularity when the issue becomes ripe.'" *United States v. Sides*, 944 F.2d 1554, 1560 (10th Cir.1991), quoting *United States v. Khoury*, 901 F.2d 948, 966 (11th Cir.1990). However a motion *in limine* "may preserve an objection if it concerns an issue that can be and is definitely ruled upon in a pretrial hearing." *United States v. Mejia–Alarcon*, 995 F.2d 982, 987–88 (10th Cir.1993).

 To evaluate when issue preservation requires renewed objection, the 10th Circuit has fashioned the following three-part test:

[T]o determine whether it was necessary for an objecting party to renew the objection at trial. First we ask whether the matter was adequately presented to the district court.... Second we determine whether the issue is of the type that can be finally decided in a pretrial hearing. That is, some evidentiary issues are akin to questions of law, and the decision to admit such evidence is not dependent upon the character of the other evidence admitted at trial ... [Finally] the district court's ruling must be definitive.

995 F.2d at 986–87 (citation omitted); *see also Palmerin v. City of Riverside*, 794 F.2d 1409, 1413 (9th Cir.1986) ("[W]here the substance of the objections has been thoroughly explored during the hearing on the motion *in limine*, and the trial court's ruling permitting introduction of evidence was explicit and definitive, no further action is required to preserve for appeal the issue of admissibility of that evidence."). When these or similar factors are not present, however, it is "incumbent upon the defense to protest [further] transgressions." *Johnson*, 35 MJ at 21. Appellant's case clearly satisfies the test requiring no further objection.[4] *Cf. United States*

your own common sense to tell you that and your own recollection of her testimony. (Emphasis added.)

4. Defense counsel did not agree to the admission of testimony from Doctor Revis that expressed his opinion on the credibility of the alleged victim's accusations in this case. The record states:
 MJ: Okay. Then the second question is in the case that you referenced that you're familiar with, how did you discover or perhaps conclude that the adolescent was not telling the truth?
 WIT: I found inconsistencies in their story, I found inconsistencies when they discussed other matters, and I saw pathological personality characteristics that would lead me to think they are the type of person who would make such things up or try to manipulate others.
 MJ: Okay. And is that consistent with examples in the literature where cases may have been made up?
 WIT: Yes.
 MJ: So there you have it. Do you object?
 IDC: *I have no problem with the first part which was read from the literature, and the basis to be determined from the literature, but if he starts getting into his personal experience and how he checks it out, I think the inference*

*there is he's going to connect it with this case based on his prior testimony earlier.*
 MJ: Well, I didn't hear anything about that here. In other words, if it was played exactly as it occurred here in court in front of the court members, do you have a problem with that?
 IDC: Captain Jones just reminded me—he's probably right—the natural follow-up question after that would be the critical one.
 MJ: Well, we can only burn one bridge at a time.
 IDC: Right.
 MJ: So, do you have an objection and, if so, what is it?
 IDC: Your Honor, *here's the thing, here's what bothers me: here he talks to [LGG], and there might be a perception out there that he thinks we have a legitimate case here, and then when he turns and says the* only time I thought it was a negative was when I didn't believe the person. *Well, if he didn't believe [LGG], I think an idiot could figure out he wouldn't be up here talking like he is today.* So I think it does, your Honor. *You know, I don't think the court's all that dumb.*
 MJ: How about if we just restrict the answer to cases in the literature?

*v. Munoz,* 32 MJ 359, 365 (CMA 1991) (Dicta; "Such defense inaction is at best puzzling and suggests waiver . . . .").

■ The final piece of evidence improperly admitted against appellant was the prosecution's expert testimony on a child sex abuser's profile.[5] The record states:

MJ: You may proceed.

Q. (TC) First of all, Dr. Revis, what I'm going to ask is that we, through voir dire, found out we've got a relatively inexperienced panel in the area of sexual abuse. So I want you to kind of give us a sexual abuse 101, if you would. First of all, can you tell us who—well, first of all, does sexual abuse, child sexual abuse—does that occur?

A. Yes.

Q. Okay. Who commits sexual abuse?

A. Who commits sexual abuse. *What is the basic profile of a perpetrator?*

Q. *Yeah,* but let me, before we even get into that—let me do this: Why don't you tell us what child sexual abuse is?

A. Okay.

\* \* \*

Q. Okay. Now, I'd asked you to talk a little bit about the people who commit these type of offenses. Can you tell us about that?

A. Well, it can be anybody, *but the most common is somebody who has a need for power and control and combination and feeling important, and this person can be somebody who, from all appearances, appears to be upstanding, law-abiding, church-going, participates in community activities, works hard, maybe even more so than the average person, and it's usually a father against a daughter or against a stepdaughter.* That's the typical perpetrator, but we also see grandparents. It's usually a male who are the perpetrators. It's very, very rare that there are female

perpetrators, but stepfather, grandparent, uncle, a much older cousin. It's usually somebody within the family that's trusted because it's got to be somebody that has ready access to the child, and most sexual because is a manipulation of affection, and it's not somebody holding a knife over somebody. They are taking advantage of that close relationship and the gullibility of the child.

Q. Let me ask you this there: Does sexual abuse only occur when there's a close relationship between say the stepfather and a daughter, close in the sense that they hang around together and they're buds, that type of thing?

A. Usually that's the case, but there are exceptions. There are cases where children get sexually abused by day-care providers, scout leaders, ministers, anybody who would be in a position to supervise kids, be alone with children. It can happen in those cases, but usually it's with a family member.

Q. Okay. Well, my question is though, okay, you may have, for example, with your parent—a hypothetical situation—a child with their parent where there's a lot of tension, there's disagreements about homework, school, the adolescent or the child may not go to the parent and disclose intimacies and have a friendship-type relationship with the parent. Do you agree that—I mean is that hypothetical uncommon?

A. It can be either way, okay.

Q. Okay. Well, what I'm doing I'm asking you, first of all, have you found varying degrees of closeness between parents and siblings in your practice?

A. Sure.

Q. Okay. So I guess what I'm trying to clarify for myself is *are you saying that if you have a father who is having difficul-*

IDC: Absolutely. I agree with that. (Emphasis added.)

5. There was no objection in this case to this evidence. However, this Court "will find plain error when there is a clear, obvious error which affects the substantial rights of the accused." *United States v. Greene,* 41 MJ 57, 58 (1994)

(citation omitted); *see generally* Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a); *see also United States v. Briggs,* 42 MJ 367, 370 (1995) (" 'Plain error requires at the very least, that there be an error; it is plain; and it affects a substantial right of the accused, *i.e.,* it was prejudicial.' ") (citations omitted.)

*ties with a stepdaughter or a daughter, then it's less likely that abuse is occurring there?*

A. *No, no, it can occur in either situation.*

Q. Okay.

A. It can be a situation where they've been the best of pals and hung around together or that they were always arguing. *The consistent dynamic is one where you have the perpetrator who is trying to control the child.* It's almost like they are leaning on them, okay. They're looking for that sense of power and control to fill their own needs. It's not just sexual, although sexual pays into it, but this power, this need for dominance, is also playing a role. So it's not just the sex or the affection that they're trying to get. Many, many different needs.

(Emphasis added.) Appellant's attributes as a male, stepfather, and churchgoer, as well as having disciplinary difficulties with his daughter, qualified him as a child sex abuser under this profile. This is a clear and obvious violation of our decision in *Banks*, 36 MJ at 162, and this evidence provided general corroborative support for the prosecution's case.

 It is well-established that an appellate court can order a rehearing based on the accumulation of errors not reversible individually. In this regard, the First Circuit has delineated the scope of the cumulative-error doctrine. It requires

consider[ing] each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy-or lack of efficacy—of any remedial efforts); and the strength of the government's case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*United States v. Sepulveda,* 15 F.3d 1161, 1196 (1993) (citation omitted); *see United States v. Banks, supra.* Moreover, when assessing the record under the cumulative-error doctrine, courts "must review all errors preserved for appeal and all plain errors." *United States v. Necoechea,* 986 F.2d 1273, 1282 (9th Cir.1993). Courts are far less likely to find cumulative error "[w]here evidentiary errors are followed by curative instructions" or when a record contains overwhelming evidence of a defendant's guilt. *United States v. Thornton,* 1 F.3d 149, 157 (3d Cir.1993).

In appellant's case, the evidence of guilt was not overwhelming; rather, the prosecution's case rested entirely on the alleged victim's credibility.[6] Reviewing the above errors in this context, we observe that appellant was initially denied an expert witness who could provide a noncriminal medical explanation for his step-daughter's testimony against him. *See United States v. Woolheat-*

6. As noted by the Court of Criminal Appeals appellant did not admit to the OSI that he sexually molested his daughter. The records states:

Q. Okay. Did you ever wake her up and sexually fondle her?
A. No, sir.
Q. And what's this about waking her up in the morning sometimes? You told OSI about laying on top of her. Would you tell the court about that?
A. *I didn't really mean lay on top of her. I mean, I move-because she's got a wide bed, when she rolls over on the other side and I have to reach her,* I have to go over across of course on top with the sheets there and reach her to wake her up, to shake her down.
Q. And how would you come in contact so you're, quote, on top of her as you told OSI?

A. Maybe they're quoting, you know, perceiving it wrong, but on top, you know, some parts of maybe my shoulder or whatever, you know, is on top, across her leg or something.
Q. Okay. In any event, were you ever laying on top of her where your head is by her head on her whole body?
A. No.
Q. Definitely not?
A. No.
Q. How about coming at an angle across her body?
A. Maybe across her, yes.
Q. In that way?
A. Yes.
Q. Did this happen very often?
A. No. I mean-not that often, no.
(Emphasis added.)

*er*, 40 MJ 170, 174 (CMA 1994). On the other hand, the prosecutor was then allowed to introduce inadmissible expert testimony bolstering the prosecutrix's truthfulness. *See United States v. Rodriguez*, 37 MJ 448, 453 (CMA 1993) (inadmissible expert testimony that accused was untruthful). Finally, the prosecution was permitted to parade expert profile testimony before the members circumstantially fingering appellant as the guilty party. *See United States v. Banks, supra.* Such unilateral piling on with inadmissible expert testimony distorted the factfinding process in this "hotly contested" case to such an extent that we find its results unreliable. We cannot say with any certainty that the cumulative effect of these errors did not affect the outcome of this case. *See United States v. Banks, supra; cf. United States v. Walker*, 42 MJ 67, 74 (1995).

The decision of the United States Air Force Court of Criminal Appeals is reversed. The findings and sentence are set aside. The record of trial is returned to the Judge Advocate General of the Air Force. A rehearing may be ordered.

Chief Judge COX and Senior Judge EVERETT concur.

GIERKE, Judge, with whom CRAWFORD, Judge joins (dissenting):

In my view, the majority reads the record selectively and stretches the evidence to reach an unwarranted result. Therefore, I dissent.

Regarding Issue I, I agree that it was error for the military judge to exclude the testimony of Chaplain McGerrity on the basis of his qualifications. I disagree with the majority's conclusion that the error, either alone or in combination with other errors, was sufficiently prejudicial to warrant reversal. While Chaplain McGerrity was offered to show that the victim was depressed and suffering from post-traumatic stress syndrome, there is no evidence and nothing in the defense proffer to show that her condition affected her ability to recall events accurately or to testify truthfully. Defense counsel stated, "If the court has enough information as to what the post-stress syn-

drome is and the symptoms for it and then they are shown the symptoms in this case, certainly the court can draw their own conclusion as to what weight to give it in terms of how it impacts on the guilt or innocence of Sergeant Dollente." Missing from this proffer is any bridge between the victim's mental or emotional condition and her credibility. Even after the military judge threw the defense a lifeline by asking if they wanted the members to infer that post-traumatic stress syndrome "would impact on the credibility or believability of the witness' testimony," defense counsel added nothing to his proffer.

The majority attempts to amplify the importance of Chaplain McGerity's testimony by asserting that "it is clearly implied in the record that [Chaplain McGerity] would also have testified that this particular mental state may be caused by traumas other than sexual assault and that such a possibility existed in this case." 45 MJ at 238. There is nothing in the record to support that assertion. In his first reference to post-traumatic stress syndrome, Chaplain McGerity was describing his clinical experience and qualifications. He made no mention of the victim at that point in his testimony. In the second record reference cited in the majority opinion, Chaplain McGerity merely diagnosed the victim as suffering from "manic depression." It is speculation to assert that Chaplain McGerity would have testified about possible causes of the victim's manic depression.

In my view, even if Chaplain McGerrity would have testified in accordance with the defense proffer, his testimony would have had minimal probative value. *See* Mil. R.Evid. 403, Manual for Courts–Martial, United States (1995 ed.). Any error in excluding this testimony was harmless when considered in the context of all the evidence in the case. Art. 59(a), Uniform Code of Military Justice, 10 USC § 859(a).

I disagree with the resolution of Issue II on two grounds. First, I disagree with the standard of review. In my view, appellant's motion *in limine* regarding the prospective testimony of Dr. Revis was not sufficient to

avoid waiver if Dr. Revis' testimony exceeded the bounds of the military judge's preliminary ruling. *See United States v. Munoz,* 32 MJ 359, 364–65 (CMA 1991). Because appellant did not make a timely objection, we should review only for plain error. *See United States v. Toro,* 37 MJ 313, 316 (CMA 1993); Mil.R.Evid. 103(d). Second, I think the opinion mischaracterizes the testimony. Dr. Revis testified that he saw no evidence that the victim was manipulative based on her answers during a diagnostic test. All that Dr. Revis was saying is that his diagnosis was valid because his test results were accurate. That is a long way from testifying that she was not lying in court.

Although I find nothing improper in Dr. Revis' testimony, trial counsel overstated his case when he argued that Dr. Revis found no evidence "that would indicate that [the victim] got up on the stand and deliberately, maliciously, vindictively manipulated this court panel in any way, shape, form or fashion." While this argument misstated the evidence and was improper, defense counsel did not see fit to object and appellate defense counsel did not see fit to raise the issue before us or the court below. Trial defense counsel's failure to object was consistent with his view of the case, as reflected in his comment to the military judge about Dr. Revis' testimony: "Well, if he didn't believe [the victim], I think an idiot could figure out he wouldn't be up here talking like he is today.... You know, I don't think the court's all that dumb." In my view, trial counsel's argument does not rise to the level of plain error. Accordingly, I would hold that any error in trial counsel's argument was waived.

Regarding Issue III, there was no error, in my view. Dr. Revis used the word "profile" when he responded to trial counsel's question, "Who commits sexual abuse?" His answer was, "it can be anybody." In other words, he testified that there is no profile of a typical abuser. The thrust of his testimony was that appearances can be deceiving, and that an abuser can be someone who "from all appearances, appears to be upstanding, law-abiding, church-going, participates in community activities, works hard, maybe even more so that the average person." In my view, this testimony is a far cry from the type of profile evidence condemned by this Court. *See United States v. Banks,* 36 MJ 150, 162 (CMA 1992) (military judge erred by permitting trial counsel to present evidence that appellant fit "profile" of child molester).

The members had before them ample evidence of the victim's hatred of appellant, her motive to lie, and her previous inconsistent statements. Nevertheless, they chose to believe the victim's accusations instead of appellant's bizarre statement to Office of Special Investigations that he sometimes awakens his 13–year–old step-daughter by lying on the bed with her, and hugs and kisses her, and sometimes "goes on top of her to wake her up." In my view, this implausible excuse was a significant factor in the court members' decision to believe the victim beyond a reasonable doubt.

I am satisfied that appellant received a fair trial. I would affirm the decision of the court below.