**UNITED STATES, Appellee,**

**v.**

**Michael R. ARMSTRONG,
Master Sergeant, U.S.
Army, Appellant.**

No. 99–0256.
Crim.App. No. 9601966.

U.S. Court of Appeals for
the Armed Forces.

Argued Jan. 11, 2000.

Decided June 1, 2000.

GIERKE, J., delivered the opinion of the Court, in which EFFRON, J., and COX, S.J., joined. CRAWFORD, C.J., and SULLI-VAN, J., each filed a dissenting opinion.

For Appellant: *Captain Katherine A. Lehmann* (argued); *Colonel Adele H. Odegard, Major Scott R. Morris,* and *Major Jonathan F. Potter* (on brief); *Colonel John T. Phelps II, Captain Leslie A. Nepper,* and *Captain John C. Einstman.*

For Appellee: *Major Patricia A. Ham* (argued); *Colonel Russell S. Estey* (on brief); *Captain Marcella Edwards–Burden.*

Judge GIERKE delivered the opinion of the Court.

A general court-martial composed of officer and enlisted members convicted appellant, contrary to his pleas, of 6 specifications of committing indecent acts with his daughter, in violation of Article 134, Uniform Code of Military Justice, 10 USC § 934. The court-martial sentenced appellant to a dishonorable discharge, confinement for 8 years, total forfeitures, and reduction to the lowest enlisted grade. The convening authority approved the sentence but suspended confinement in excess of 2 years for 2 years.

In an unpublished opinion, the Court of Criminal Appeals set aside the convictions of 3 specifications, and it dismissed those specifications on the ground that the evidence was factually insufficient under Article 66(c), UCMJ, 10 USC § 866(c). The court affirmed the convictions of the 3 remaining specifications, reassessed the sentence, and reduced the period of confinement from 8 to 5 years.

Our Court granted review of the following issue:

WHETHER THE ARMY COURT OF CRIMINAL APPEALS ERRED WHEN IT HELD THAT THE TESTIMONY GIVEN BY A GOVERNMENT EXPERT ON REBUTTAL WAS IMPROPER, BUT HELD THAT THE ERROR WAS HARMLESS.

For the reasons set out below, we reverse.

### Factual Background

The prosecution case-in-chief consisted of the testimony of appellant's natural daughter, CA; Lieutenant (Lt) Goss, a member of the Watertown, New York, Police Department; and a written statement executed by appellant in response to questioning by Lt Goss.

CA was 17 years old at the time of appellant's trial, conducted between September 30 and November 22, 1996. The offenses affirmed by the court below were alleged to have been committed between December 15, 1994, and May 28, 1996. CA shared a bedroom with her twin sisters, NA and AA, who are 5 years younger than CA. CA slept on the top bunk of a bunk bed; NA and AA slept on the bottom bunk.

CA testified that she did not use an alarm clock to awaken, because it would awaken her twin sisters. Instead, she depended on appellant to awaken her in the morning before he went to work. She testified that when appellant first began awakening her, he would shake her and rub her shoulder. She testified that he would hoist himself on the bunk bed railing, "half off and half on," but that "he got tired of it or something" and began climbing onto the bed. She testified that appellant sometimes lowered himself over her open hand so that his penis was in her open hand. When he did so, he was wearing underwear and CA was wearing a shirt and panties. CA testified that she could not remember how many times appellant lowered himself into her hand, but it was "infrequent." CA testified that she pretended to be asleep.

CA also testified that she recalled appellant nibbling her ear, kissing her face, and rubbing her shoulders under her shirt. She testified that when he rubbed her shoulders, "he was very careful not to—you know, touch anything there." She believed that appellant "made a point" to avoid touching her breast area when he had his hand under her shirt.

CA testified that she could not remember how long appellant would rub her arms and shoulders. She explained, "When you're asleep, you don't have very much concept of time." She testified that she pretended to be asleep, "because usually I'm like—when he wakes me up, I'm half asleep or something." (R. 165)

Trial counsel then asked CA, "[W]hat else would your father do?" She responded, "That's basically it." Only after trial counsel refreshed her memory with a statement she gave the Watertown police did she testify that appellant would sometimes lie down facing her, "[w]ith his hip area on [her] hip area." She testified that while appellant was in that position, he would rub his penis "right on the juncture of [her] thighs." She was wearing a shirt and underwear, and appellant was wearing underwear. She pretended to be asleep. As with her other testimony, she could not remember how long appellant would lie in bed with her. CA testified that she did not tell appellant to stop touching her. Instead, she tried to indirectly stop him by telling him that she did not need him to awaken her any more.

On cross-examination, CA testified that she has difficulty remembering details, but that she remembers "big things that happened." She testified that she was an avid reader of romance novels, liked to write poetry, and hoped to be a writer some day. She testified that she never told her mother or her sisters that appellant was touching her inappropriately. CA also testified that appellant sometimes would lie beside her, put his arms around her, and "cuddle," without doing anything inappropriate.

On redirect examination, CA testified that she never told appellant she was awake when he was doing the inappropriate acts she described. Asked to explain why, she testified, "Because if—cause he could have—because something like that could have happened more that I don't want to think about right now. He could have went berserk or some-

thing. I don't know." On recross, CA admitted that even when appellant was angry with her for misbehaving, he "wasn't really berserk," but it was the closest to "berserk" she had ever seen. She testified that appellant "hardly ever gets mad."

Lt Joseph Goss testified that he interviewed appellant after receiving a report of possible sexual abuse from the Jefferson County Child Protective Service. According to Lt Goss, when appellant was advised of the allegations of inappropriate behavior with his two oldest daughters, he orally "indicated that the nature of the allegations were true, and that he believe[d] he had used poor judgment." Appellant agreed to reduce his oral statement to writing.

Appellant's written statement included the following narrative:

Concerning the reason that I am at the police station: Since I have thought about what has been said I would like to state that I have used poor judgment. My actions which are the basis of this complaint were never meant to give me sexual gratification or injure my daughters. As for the statement about me touching [CA's] chest/breasts I have possibly touched them by accident while giving her a massage.

In the morning before going to work I would occasionally enter [CA's] bedroom and give her a kiss good-bye. Sometimes I would also massage her shoulders, neck and I accidently touched her where she did not feel comfortable. At no time did [CA] indicate that she did not like this or ask me to stop until last Thursday May 23rd. Some time ago there was also an incident where my penis touched [CA's] hand. This was not intentional, but I was in my underwear and I was massaging her. One of us moved and my penis went across her hand. Again this was an accident.

Lt Goss has also asked me about my 15–year–old daughter [CL]. There were also occasions when I would go into her room and kiss her. This is also a similar situation where I would be leaving for work and saying good-bye. To the best of my knowledge I did not think that she did not

like this or felt it was inappropriate. This was never meant to hurt my daughters.

... I also would like to add that I have entered my 11–year–old twins' room to kiss them good-bye, but because they usually sleep back to back and are normally asleep I did not want them to wake up an hour and a half early so I would only kiss them.

In closing I would like to say that my actions were never meant to hurt, injure or scare anybody. If I had realized that the girls did not like this I would not have continued. I do love my family a great deal and will do anything to help keep my family together. I am willing to go to counseling or attend any program as directed by the Family Court.

The defense theory was that appellant was a devoted, affectionate father, and that CA's accusations were nothing more than "the ambiguous statements of a troubled young girl." The defense case-in-chief consisted of the testimony of appellant's wife, 15–year–old daughter (CL), one of the 12–year–old twins, and a psychologist who evaluated CA.

Appellant's wife of 21 years testified that she suffered from several medical conditions that cause shaking and dizziness. One of the twin daughters has hypotonic cerebral palsy, requiring that she be constantly monitored. Because of his wife's and daughter's medical conditions, appellant became very involved in caring for their daughters and assisting with the household chores. The family uses a term, "CHS," that stands for cuddles, hugs, and snuggles, to describe what they like to do at bedtime and in the morning. Appellant's wife testified that all their daughters love massages, and they frequently ask their parents for back rubs.

Appellant's wife testified that around Halloween of 1994, shortly before the dates on which the offenses were alleged to have been committed, CA had a sexual relationship with a boyfriend, and she began withdrawing from "her affections towards the rest of us in the family." Asked about her opinion of CA's truthfulness, appellant's wife testified that "she gets so wrapped up with her books and very involved in her TV programs, that

sometimes [she] wondered if [CA] gets her reality and her fantasies mixed up."

Appellant's wife described appellant as a very loving, very attentive father. She testified, "He's always been there for the girls. He got to see them born and—which he was ecstatic about. He's always very helpful. He's always willing to listen to them, to be there for them, whatever needs that need to be met at that time, and I wouldn't trade him for the world."

On cross-examination, appellant's wife testified that the door was always open when appellant went into CA's room to hug her. She testified that most of the time appellant was wearing Army physical training clothes. She admitted that there were times when he wore only underwear and a T-shirt, "but he's done that all their lives."

Appellant's 15–year–old daughter, CL, testified that appellant sometimes would awaken her with a "snuggle" or a massage. Appellant would spend "a few minutes" with her, during which "he'd say goodbye real quick, or if he had enough time, he would snuggle a little bit." She did not remember what he was wearing. Asked if appellant ever touched her improperly, she responded, "Maybe accidentally."

CL testified that CA had been "pretty truthful" during the "last few years," but she "wasn't real truthful" when she was younger. CL described CA as "a dramatic person" and "very emotional." She testified that CA's fellow high school students either "think she's really nice or she's weird."

Appellant's 12–year–old daughter, AA, testified that appellant normally came into their room at about 6:00 a.m., tapped them on the back and said, "I'm leaving for work now, bye, I love you." He usually kissed them. There were times when he would lie in bed with AA and her twin sister. Sometimes he would be dressed in a T-shirt and shorts and sometimes he would be wearing a jogging suit. AA testified that she liked it when appellant came into her room in the morning.

Community Mental Health Services at Fort Drum, New York, referred CA to Dr. Gina Scarano–Osika, a licensed psychologist, for treatment. Dr. Scarano–Osika inter-viewed CA a number of times and conducted psychological testing. She concluded that CA's perceptual capacity was unflawed, but that she "may be prone to perceptual inaccuracies." She also concluded that CA had a history of getting very involved in the lives of television characters and that "she had a nonconventional way of acting interpersonally."

On cross-examination, Dr. Scarano–Osika testified that CA did not suffer from hallucinations or a "psychotic-like or schizophrenic-like problem." Based on CA's use of fictional characters as an escape, Dr. Scarano–Osika concluded that CA has an acute stress disorder that causes a dissociative reaction. She defined a dissociative reaction as "when someone pulls back from themselves or feels like they're somebody different or identifies with someone different."

Appellant testified in his defense. He described his military career beginning with his enlistment in December 1973. He described his family life and his courtship and marriage, and the birth of his daughters, CA and CL. During the early 1980s, after CL was born, appellant began visiting his daughters before going to work, making sure that they were covered up, and he would "give them a little quick kiss goodbye, maybe a little hug, something along those lines." Asked how he would describe his demonstration of affection towards his children, appellant testified,

> I used—we used to hug them all the time. I mean, until I was no longer allowed contact with them [as a result of the charges]. I still hug them every day. I hug them and hold them. They sit on my lap, they come climb on my lap when I'm sitting down. Very affectionate, sir.

Appellant testified that in the morning, he would sit down next to them, "give them a little hug," give them a back rub, or lie down next to them and "cuddle or snuggle together." Asked to explain why he did these things, appellant testified that he did them "to share some time with them." He explained:

> I mean, I get home—even if I got home somewhat early, there's still all those eve-

ning things that need to be done. They've—there's dinner that's got to be prepared. I prepared dinner a fair amount of the time. They had homework that they had to do, and [CA] and [CL] especially asked me to help them with their homework—and [AA] sometimes. So, there was dinner to do and homework to help them with. I had my laundry to do. If they had laundry that needed to get done, I did that a fair amount of the time. And—so, they've got to eat, they've got to finish their homework, and so then generally, it's about time for them to be getting ready for bed. So, I didn't have a lot of time to spend with them in the evenings. So in the morning, I'd try and spend a little bit of time with them to make me—me feel better about the time I can't spend with them, and to—just kind of start their day off with—with a warm feeling that they know that—even if they can't remember that their dad's been there, they know that—that I come in and I at least kiss them goodbye. They know I've been there, and they feel a little bit better about the day.

Appellant testified that his only intention was to share some time with his daughters and "intensify that father-child bond." He denied lying on top of CA and rubbing his groin area on hers. He denied placing his penis in CA's hand. He denied rubbing her chest. He denied doing anything for the purpose of arousing, appealing to, or gratifying his lust or sexual desires.

Appellant testified that he was in a state of shock during his interview with Lt Goss. He was surprised at CA's accusation and surprised to find out about her sexual activity with her boyfriend. He tried to figure our how his morning routine could have been misinterpreted. He could not remember any specific contact that might have been inappropriate, and he tried to explain that any touching of her breast area or any brushing of his groin against her would have been accidental.

On cross-examination, appellant admitted that "on occasion," he gave CA massages and lay in bed with her while in his underwear.

He acknowledged that in his statement to Lt Goss he admitted using poor judgment.

On redirect, appellant explained his admission of poor judgment as follows:

I think that what I meant by poor judgment was—it—it sort of involves the way that I think about myself, the way I—I care about my family, about the beliefs that I hold, and about the way that the—your traditional Christian community views people who, a traditional Christian would say, "is outside of that community." You have the—the Christian community and you have the world, if you will. And, thinking at that time, yes, someone looking from the outside; not knowing us, not knowing me, not knowing what's in my heart which I do, would say that that was something that would—that ought not be done. And from that—from that aspect, I—I would say that that would—that could qualify as poor judgment. On the other hand, to myself, my girls have always been my little girls. They'll—no matter how big they get, no matter how this turns out, they will still be my girls. And, the best picture I've got of them is as young children. I see them that way. You know, actually, I can see them that they're—they've grown up. They're in high school—two of them are. But, that—they're still small to me. Their—their physical attributes, if you will, they don't—they don't bother me. They don't cause me any concern. When I hug them, I hug them because I hug them. It—it's not a factor in how I treat them. They're just my girls. I've always felt that way. I still feel that way.

In rebuttal, the prosecution presented the expert testimony of Dr. Lynn Geiger, a psychologist. Her testimony is the basis for the granted issue. Dr. Geiger works as a "validator" for the Jefferson County Department of Social Services. She is employed to evaluate children to determine if they display symptoms of having been sexually abused. The defense made a motion in limine, objecting to Dr. Geiger's testimony on multiple grounds, including an objection to "human lie detector" testimony. The prosecution made

an offer of proof that Dr. Geiger would testify that CA shows symptoms consistent with sexual abuse, and that sexual abuse is the most likely cause of her symptoms, including her tendency to fantasize. The prosecution agreed that it would not use the term "validator." The military judge overruled the defense objection and permitted Dr. Geiger to testify "in the limited area" described in the prosecution offer of proof.

Before the members, Dr. Geiger described her extensive training, clinical experience, awards, and extensive experience as an expert witness—having testified "about 200 times." She was accepted as an expert on the subject of child sexual abuse, with no defense objection. She testified that she conducted 1 interview of CA that lasted about 1 hour. She did not interview CA's parents. When Dr. Geiger was asked if she was able to form an opinion "as to whether [CA] exhibited characteristics and responses consistent with those exhibited by victims of sexual abuse," defense counsel objected on the ground that there was no foundation for such an opinion because it was based only on a 1–hour interview. The military judge overruled the objection. Dr. Geiger then testified, "My opinion is that the information that I obtained during the course of the evaluation with [CA] is highly indicative of her being sexually abused by her father." Defense counsel did not restate his earlier objection, but proceeded to cross-examine Dr. Geiger regarding the basis for her opinion. Defense counsel also asked Dr. Geiger if there could be explanations for CA's behavior other than sexual abuse. She responded, "Absolutely."

Immediately after Dr. Geiger testified, the military judge instructed the members as follows:

> You are advised that only you, the members of the court, determine the credibility of the witnesses and what the facts of this case are. No expert witness can testify that the alleged victim's account of what occurred is true or credible, or that a sexual encounter occurred. To the extent that you believe that Dr. Geiger testified or implied that she believes the alleged victim or that a crime occurred, you may not consider this as evidence that a crime occurred.

He gave substantially the same instruction before the members closed to deliberate on findings.

### Discussion

The granted issue challenges only the harmless-error analysis by the court below. The court below held that Dr. Geiger's testimony was improper, and the Government does not challenge that holding.

Although the court below appears to have treated the error as constitutional error, we agree with the Government that the error in this case is a nonconstitutional evidentiary error. *See United States v. Charley*, 189 F.3d 1251, 1270 (10th Cir.1999) (counselor's testimony of counselors impermissibly vouching for credibility of victims treated as nonconstitutional error).

■ The test for harmless error is "whether the error itself had substantial influence" on the findings. *United States v. Pollard*, 38 MJ 41, 52 (CMA 1993), quoting *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946). "If so, or if one is left in grave doubt, the conviction cannot stand." *Id.*; *see also United States v. Adams*, 44 MJ 251, 252 (1996).

■ We are not persuaded that the error was harmless. This case pitted the credibility of a senior noncommissioned officer with 23 years of honorable service against the ambiguous, uncertain testimony of a 17–year–old girl who appeared to live in a fantasy world and "may be prone to perceptual inaccuracies." Appellant's wife and 15–year–old daughter supported him in his defense. Appellant's written statement to the police admitted only accidental contact and poor judgment. There was no physical or testimonial evidence to corroborate CA's testimony. CA was not a strong witness, but Dr. Geiger was powerful. Dr. Geiger threw the full weight of her impressive curriculum vitae behind her unequivocal and highly prejudicial conclusion that CA was sexually abused by her father.

We have often held that a curative instruction can render an error harmless. *See, e.g., United States v. Harris,* 51 MJ 191, 196 (1999); *United States v. Anderson,* 51 MJ 145, 151 (1999); *United States v. Skerrett,* 40 MJ 331, 333–34 (CMA 1994). In this case, however, we have "grave doubts" about the military judge's ability to "unring the bell." *Kotteakos v. United States, supra.* Accordingly, we must reverse.

## Decision

The decision of the United States Army Court of Criminal Appeals is reversed. The findings of guilty and the sentence are set aside. The record of trial is returned to the Judge Advocate General of the Army. A rehearing is authorized.

CRAWFORD, Chief Judge (dissenting):

I disagree with the majority's conclusion that the error substantially influenced the findings. I also disagree that the victim's (CA's) testimony was ambiguous and uncertain, and that she "may be prone to perceptual inaccuracies."

Dr. Scarano–Osika, the defense expert, conducted a variety of psychological tests on CA. She testified that based upon the Rorschach Test, CA's perceptual capacity was unflawed at the time of the testing. She also testified that it is possible CA could be prone to perceptual inaccuracies *in the future,* but that "[t]here are many factors that could prevent that from happening." This was confirmed on cross-examination. There is simply no indication in the record that CA was prone to perceptual inaccuracies at the time of the testing. Also, I find compelling CA's repeated testimony that she did not tell appellant to stop or warn her sisters of appellant's behavior because she "didn't know" her father when he was sexually abusing her, and that he was a "different person" then.

In my view, CA was a strong witness, and Dr. Geiger's testimony was harmless. Her opinion was based on a 1–hour interview, and. Dr. Geiger admitted that there could be other traumatic events which might explain CA's behavior.

SULLIVAN, Judge (dissenting):

The members found appellant guilty of 3 specifications of committing indecent acts with his 15–year–old daughter. The appellate court below stated:

The victim of MSG Armstrong's misconduct was his eldest daughter, CA. CA was born on 15 December 1978. The first three specifications alleged that three distinct, indecent acts (rubbing CA's chest and neck area, placing his penis in CA's hand, and rubbing his groin area against his daughter's groin area) occurred "on diverse occasions" between 1 November and 14 December 1994.

Unpub. op. at 2.

The majority sets aside these convictions because opinion testimony from a government witness, Doctor Geiger, was improperly admitted at appellant's court-martial over defense objection. The majority also specifically holds that it is not persuaded that such error was harmless. I conclude, based on the entire record in this case, that this objected-to evidentiary error was harmless because it did not "materially prejudice[ ] the substantial rights of [appellant]." Article 59(a), UCMJ, 10 USC § 859(a); *see United States v. Charley,* 189 F.3d 1251, 1272 (10th Cir.1999); *cf. United States v. Dollente,* 45 MJ 234 (1996).

Turning first to the evidentiary error, I agree with the appellate court below that it occurred. *See United States v. Suarez,* 35 MJ 374, 376 (CMA 1992) (Expert testimony admissible to "help[ ] explain why many sexually abused children delay reporting their abuse, and why many children recant allegations of abuse and deny that anything occurred."). At the very least, expert testimony concerning the typical responses of child sex abuse victims is admissible at court-martial if a proper foundation is laid. *Id.* Here, the alleged victim's failure to object to her father's conduct or to call it to the attention of some other adult was a focal point of the defense's attack on her credibility. Moreover, the defense attacked the victim's credibility on the basis of a defense expert's view that she "may be prone to perceptual inaccuracies." Thus, the prosecution properly

asked Dr. Geiger: "Based upon your interview with [CA], were you able to form an opinion as to whether she exhibited the characteristics and responses consistent with those exhibited by victims of sexual abuse?" *Id.; see United States v. Charley, supra* at 1264–65.

However, Dr. Geiger's testimony in response to this proper and reasonable question was inadmissible. She replied: "My opinion is that the information that I obtained during the course of the evaluation with [CA] is highly indicative of her being sexually abused by her father." This response goes far beyond the question asked and that permitted by military law. *See United States v. Birdsall*, 47 MJ 404, 410 (1998); *see also United States v. Charley, supra* at 1266–68. The core question then becomes one of harmless error under Article 59(a). The majority has "grave doubts" concerning the harmlessness of such error. As I explain later, I do not. First, I wish to focus on the majority's reasoning.

In reversing this case, the majority engages in an unwarranted attack on the alleged victim's testimony. It describes her testimony as "the ambiguous, uncertain testimony of a 17–year–old girl who appeared to live in a fantasy world and 'may be prone to perceptual inaccuracies.'" 53 MJ at 81. However, when a reasonable person reads the record in this case, it appears that facts, not fantasies, were presented to the jury. In fact, appellant clearly corroborated key portions of the victim's testimony in his own pretrial statement admitted at this trial. (Prosecution Exhibit 6). There, appellant stated:

CONCERNING THE REASON THAT I AM AT THE POLICE STATION: SINCE I HAVE THOUGHT ABOUT WHAT HAS BEEN SAID I WOULD LIKE TO STATE THAT I HAVE USED POOR JUDGEMENT. MY ACTIONS WHICH ARE THE BASIS OF THIS COMPLAINT WERE NEVER MEANT TO GIVE ME SEXUAL GRATIFICATION OR INJURE MY DAUGHTERS. AS FOR THE STATEMENT ABOUT ME TOUCHING [CA'S] *CHEST/ BREASTS I HAVE POSSIBLY TOUCHED THEM BY ACCIDENT WHILE GIVING HER A MASSAGE.*

IN THE MORNING BEFORE GOING TO WORK I WOULD OCCASIONALLY ENTER [CA'S] BEDROOM AND GIVE HER A KISS GOOD–BYE. SOMETIMES I WOULD ALSO MASSAGE HER SHOULDERS, NECK AND *I AC- CIDENTLY TOUCHED HER WHERE SHE DID NOT FEEL COMFORTABLE.* AT NO TIME DID [CA] INDICATE THAT SHE DID NOT LIKE THIS OR ASK ME TO STOP UNTIL LAST THURSDAY MAY 23RD. SOME TIME AGO THERE WAS ALSO AN INDICENT [sic] WHERE MY PENIS TOUCHED [CA'S] HAND. *THIS WAS NOT INTENTIONAL, BUT I WAS IN MY UNDERWEAR AND I WAS MAS- SAGING HER. ONE OF U.S. MOVED AND MY PENIS WENT ACROSS HER HAND.* AGAIN THIS WAS AN ACCIDENT.

(P.E. 6). Obviously, the alleged victim did not fantasize about all of the inappropriate touchings in this case.

The majority also errs in evaluating appellant's testimony solely in terms of his credibility as a senior noncommissioned officer with 23 years of honorable service. Appellant's actual testimony in this case must also be considered. He explained his practice of entering his daughter's bed early in the morning before she awoke as follows:

So in the morning, I'd try and spend a little bit of time with them to make me— me feel better about the time I can't spend with them, and to—just kind of start their day off with—with a warm feeling that they know that—even if they can't remember that their dad's been there, they know that—that I come in and I at least kiss them goodbye. They know I've been there, and they feel a little bit better about the day.

(R. 333). He further explained why he did not wake his children at this time:

Q. Did you think that they would be able to remember that you had done this?

A. *It's—it's possible. I've heard stories of where personnel—people who are in comas, if you read to them, sing to them and so on, that some doctors will claim that that helps them.* It helps maintain a hold on reality and such, and so I had sort of the same idea in mind. Even if they can't remember for sure I was there, you know, they—maybe it would transfer a little bit like that. And again, at least I felt better if I had spent some time with them during the day.

(R. 333) (Emphasis added.) Finally, he admitted that he occasionally did this while in his underwear.

In my view, appellant's testimony is damning material for the jury, and his "innocent explanations" could reasonably be discounted by the jury. Moreover, appellant's testimony is substantially different from that presented in *United States v. Dollente*, 45 MJ at 234. In that case, the accused basically asserted that he had a regular practice of crawling into his teenage daughter's bed in the morning to wake her, and he may have accidentally touched her in inappropriate places during this process. Moreover, in *Dollente, supra,* the alleged victim recanted her accusations of sexual abuse prior to trial. Here, the alleged victim did not recant her testimony, and appellant's explanation of his own conduct was considerably more bizarre than that presented by the accused in *Dollente.** In these circumstances, I am convinced that this case was not as close as the majority indicates. *Id.* at 238.

The majority opinion's legal standard for determining harmless error is correct. Consistent with my separate opinion in *United States v. Powell,* 49 MJ 460, 466 (1998) (Sullivan, J., concurring in the result), on plain error, the majority follows Supreme Court cases on the subject of harmless error when we are interpreting and applying Article 59(a). *See United States v. Berry,* 1 USCMA 235, 239, 2 C.M.R. 141, 145 (1952); *United States v. Lee,* 1 USCMA 212, 216, 2 C.M.R. 118, 122 (1952); *United States v. Lucas,* 1 USCMA 19, 23, 1 C.M.R. 19, 23 (1951). More particularly, it follows the harmless error standard enunciated in *Kotteakos v. United States,* 328 U.S. 750, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946), and recently discussed in *O'Neal v. McAninch,* 513 U.S. 432, 115 S.Ct. 992, 130 L.Ed.2d 947 (1995). The Supreme Court indicates that it is somewhat misleading to focus on which party has the burden and whether that burden has been met when an appellate court reviews for harmless error. The real question the Court is asking itself when applying the legal standard of harmless error is, "Do I, the judge, think that the error substantially influenced the jury's decision?" *O'Neal,* 513 U.S. at 436, 115 S.Ct. 992; *see also Brecht v. Abrahamson,* 507 U.S. 619, 637, 113 S.Ct. 1710, 123 L.Ed.2d 353 (1993) (did error have substantial and injurious effect on or influence in determining the jury's verdict). If the appellate court concludes that the error did not have a substantial influence on the outcome or has no grave doubt that it had such effect, the error is harmless. *See United States v. Charley,* 189 F.3d at 1270, 1272.

As to my view on harmless error in this case, my independent review of the record shows that no actual prejudice inured to appellant as a result of the evidentiary error noted above. Strong curative instructions were given by the military judge prohibiting the improper use of Dr. Geiger's testimony, once after she testified and once again during the instructions before deliberation. *See United States v. Harris,* 51 MJ 191, 196 (1999)(instructions to the members absolved any resultant harm from admitting numerous

---

* Unlike in this case, Judge Gierke, in *Dollente, supra,* took a less sympathetic view of the accused child abuser's explanations and characterized Staff Sergeant Dollente's statement to the Office of Special Investigations that he "sometimes awakens his 13–year–old step-daughter by lying on the bed with her, and hugs and kisses her, and sometimes 'goes on top of her to wake her up,' " as being "bizarre" and an "implausible excuse." *United States v. Dollente,* 45 MJ 234,

244 (1996) (Gierke, J., with whom Crawford, J., joins, dissenting). One might find more incredible, however, the instant appellant's explanation of his regular practice of bonding with his teenage daughters by massaging them every morning before they awake (R. 333, 336), sometimes in his underwear, in hopes of starting their day off with a warm feeling (like helping "people who are in comas").

instances of improper testimony). Moreover, Dr. Geiger's unsolicited answer was not exploited by the Government, and it was not referred to by either party in their closing arguments. Also, appellant's story of his regular practice of massaging his 15-year-old daughter in her bed each morning, sometimes in his underwear, in order to personally bond with her while she was asleep, did not have great exculpatory value. *See United States v. Weeks,* 20 MJ 22, 25 (CMA 1985).

On the other hand, the Government presented a strong witness in CA, whose story was corroborated to a large degree by appellant's damaging admissions to civilian police. Finally, in view of the "relatively modest amount of erroneously admitted testimony" from Doctor Geiger, I am convinced that this error did not materially prejudice appellant. *See United States v. Charley, supra* at 1270 n. 29, 1272 (*affirming conviction* based on Court of Appeals' own evaluation for absence of prejudice). In the case before us, the record shows appellant received a fair trial before a jury that properly convicted him. The jury fairly heard both sides in this case and decided against the appellant. Accordingly, I see no legal reason to disturb this jury's verdict. I would affirm this case.