# UNITED STATES NAVY–MARINE CORPS COURT OF CRIMINAL APPEALS

———————————

## No. 201400321

———————————

### UNITED STATES OF AMERICA
*Appellee*

v.

### Martin S. ANDERSON
Chief Electronics Technician (E-7), U.S. Navy
*Appellant*

———————————

Appeal from the United States Navy-Marine Corps Trial Judiciary

Military Judge: Captain Robert Blazewick, JAGC, USN.
*DuBay* Hearing Judge: Captain Robert J. Crow, JAGC, USN.

For Appellant: Lieutenant R. Andrew Austria, JAGC, USN.
For Appellee: Major Kelli A. O'Neil, USMC;
Lieutenant Allyson L. Breech, JAGC, USN.

———————————

Decided 2 November 2018

———————————

Before HUTCHISON, FULTON, and PRICE,[1]
*Appellate Military Judges*

———————————

**This opinion does not serve as binding precedent but may be cited as persuasive authority under NMCCA Rule of Practice and Procedure 18.2.**

HUTCHISON, Senior Judge:

A military judge sitting as a general court-martial convicted the appellant, contrary to his pleas, of one specification of sexual assault in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920 (2012 ed.), but acquitted him of another specification of sexual assault and of a sin-

———————————

[1] Senior Judge Price took final action in this case prior to detaching from the court.

gle specification of aggravated assault in violation of Article 128, UCMJ. The military judge sentenced the appellant to 14 months' confinement, reduction to paygrade E-4, and a dishonorable discharge. The convening authority (CA) approved the sentence and, with the exception of the punitive discharge, ordered it executed.

The appellant initially raised four assignments of error (AOEs): (1) the evidence was factually insufficient; (2) the military judge erred in denying a second defense character witness; (3) the staff judge advocate (SJA) erred by advising the CA that he could not consider a clemency letter from the appellant's command master chief; and (4) the appellant was denied the effective assistance of counsel by his trial defense counsel, LT JB.

On 4 August 2015, we set aside the CA's action and returned the record to the Judge Advocate General for remand to an appropriate convening authority for new post-trial processing.

On 23 February 2016, the CA again approved the findings and sentence as adjudged. The appellant filed a supplemental brief and raised three additional AOEs: (5) the appellant's due process right to speedy post-trial processing was violated; (6) the SJA improperly applied the provisions of Executive Order (E.O.) 13669 during the appellant's post-trial processing;[2] and (7) the White House injected unlawful command influence into the case by referring a letter from the complaining witness to the appellant's command.

After twice requiring LT JB to submit affidavits answering questions raised by the appellant, we granted the appellant's motion for a *Dubay*[3] hearing and returned the record to the Judge Advocate General.[4]

Following the *Dubay* hearing, the military judge made findings of fact and conclusions of law, returned the record to this court, and we granted the appellant's request to file two supplemental AOEs: (8) the appellant's due process right to timely review of his appeal had been denied; and (9) the appellant is entitled to meaningful relief even without a showing of prejudice when there is unreasonable post-trial delay.[5]

Having reviewed the record of trial, the record of the *Dubay* proceeding, and the pleadings of the parties, we conclude that the appellant received inef-

---

[2] E.O. 13669 updated the Rules for Courts-Martial.

[3] *See United States v. Dubay*, 37 C.M.R. 411 (U.S.C.M.A. 1967).

[4] NMCCA Order of 28 Dec 16. We denied a government motion to reconsider *en banc* our decision to order a *Dubay* hearing. *See* NMCCA Order of 7 Feb 17.

[5] For continuity, we have renumbered the appellant's supplemental AOEs.

fective assistance of counsel. Accordingly, we set aside the findings and sentence.[6]

## I. BACKGROUND

The appellant and AA were married in 2004, and had two children together. By February 2013, however, their marriage was in trouble. On the night of 1 February 2013, after the appellant and AA got into an argument, the appellant retrieved a handgun, loaded it, placed it to his head, and said he wanted to kill himself. Base police responded to the appellant's on-base residence, confiscated the gun, and removed him from the home. The appellant was admitted to a behavioral health center for treatment.

On 6 March 2013, AA filed for divorce and shortly thereafter made the allegations giving rise to the appellant's referred court-martial charges.

### A. Trial

The appellant was charged with two specifications of sexual assault for having sex with AA when she was incapable of consenting due to impairment by the medically-prescribed sleep aid, Ambien. Specification 1 alleged that the appellant sexually assaulted AA "at or near Honolulu, Hawaii, on divers occasions between on or about 28 June 2012 and on or about 30 June 2012[.]"[7] Similarly, specification 2 alleged that he sexually assaulted AA "at or [near] Charleston, South Carolina, on divers occasions between on or about 30 June 2012 and on or about 1 February 2013[.]"[8] In addition, the appellant was charged with a single specification of aggravated assault—by pointing a loaded firearm at AA—during his suicidal ideation on the night of 1 February 2013.

AA testified that she was prescribed Ambien because she was experiencing stress and had difficulty sleeping. She explained that after she took Ambien, she was "completely out . . . you could probably set off a bomb next to [her] and [she] wouldn't even hear it"; and that she was unable to understand her surroundings or make conscious decisions.[9] AA further testified that she told the appellant not to have sex with her after she had taken Ambien. Nevertheless, she would often "briefly" be awakened "with [the appellant] on top of [her]" having sex with her.[10] Although she would try to "push him off" she

---

[6] Our disposition renders the remaining AOEs moot.

[7] Charge Sheet.

[8] *Id.*

[9] Record at 75.

[10] *Id.* at 80.

was unable to do so because he was "too strong," and would eventually fall back asleep due to the effects of Ambien.[11] AA testified that she knew the sexual assaults occurred during the two-day charged period in Hawaii because she remembered that the sexual assaults happened after a doctor's appointment she had on 28 June 2012—a pain management appointment she "had waited six months to get"—and before they transferred from Hawaii on 30 June 2012.[12] According to AA, after she moved with the appellant to Charleston, the appellant sexually assaulted her "probably a dozen" more times.[13] Finally, AA testified that while she was trying to talk the appellant out of killing himself on the night of 1 February 2013 the appellant pointed the gun at her.

Besides AA's testimony, the only other government evidence presented at trial was the testimony of the appellant's aunt. The appellant's aunt testified about an uncharged incident during a 2009 visit she had with the appellant and AA in Connecticut. She explained that one night while playing video games with the appellant after AA had gone to bed, the appellant told her "I'm going to go upstairs and take advantage of my wife. . . . The Ambien ought to have kicked in by now . . . ."[14] The appellant's aunt further testified that after going upstairs she heard a "scared" female voice coming from the appellant's bedroom.[15] When she knocked and asked the appellant if everything was alright, the appellant responded, "[e]verything is okay. . . ."[16] The military judged admitted the aunt's testimony to show the appellant's motive, opportunity, intent, and lack of mistake under MILITARY RULE OF EVIDENCE (MIL. R. EVID.) 404(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2012 ed.).[17]

The appellant called one witness, Chief CE, his friend and co-worker. Chief CE testified that in his opinion AA was untruthful and had a reputation within the appellant's command for being untruthful. LT JB attempted to call Ms. E—Chief CE's wife—to testify telephonically. The trial counsel objected, pointing out that the defense did not seek Ms. E's production and had provided no notice to the government that Ms. E would testify telephonically.

---

[11] *Id.* at 81

[12] *Id.*

[13] *Id.* at 82.

[14] *Id.* at 115-16.

[15] *Id.* at 118.

[16] *Id.* at 120.

[17] *See* Appellate Exhibit (AE) XXVII at 3.

The military judge sustained the government's objection, ruling that Ms. E's testimony was not relevant and necessary as it would be cumulative with that of Chief CE's, and that LT JB had failed to show good cause why Ms. E's telephonic testimony should be allowed in contravention of the court's rules, which required counsel to file a motion requesting the use of remote live testimony.

Ultimately, the military judge acquitted the appellant of the Hawaii sexual assault specification and of the aggravated assault charge, but convicted him of sexually assaulting AA on divers occasions at or near Charleston. Pursuant to RULE FOR COURTS-MARTIAL (R.C.M.) 918(b), MANUAL FOR COURTS-MARTIAL, UNITED STATES (2102 ed.), the military judge issued special findings concluding that:

1. After AA takes Ambien, "[s]he does not know what is going on, cannot make any conscious decisions, and is unable to let anyone know of her choices";[18]

2. AA and the appellant discussed on several occasions the effect that Ambien had on AA;

3. AA asked the appellant on numerous occasions to "not have sex with her while she was on Ambien as she would like to remember it";[19]

4. AA is sure she never consented to sexual acts while on Ambien; and

5. AA was "able to do things seemingly inconsistent with being incapacitated. She was able to make purchases on-line . . . as well as purchased some apps on her phone" but had no memory of these activities.[20]

## B. Allegations of ineffective assistance of counsel

Along with his initial brief before this court, the appellant submitted a declaration made under penalty of perjury alleging that LT JB failed to use evidence he provided her and failed to call additional witnesses in his defense.[21]

After we remanded the case for new post-trial processing, the appellant—with new counsel—submitted matters in clemency, also alleging that LT JB

---

[18] AE XXXVII at 2.

[19] *Id.*

[20] *Id.* at 3.

[21] *See* Appellant's Brief of 6 Apr 15 at Appendix 4 (Declaration of Appellant of 3 Apr 15).

was ineffective.[22] In a sworn affidavit submitted to the CA, the appellant asserted that although he asked LT JB to contact his civilian divorce attorney because the attorney had useful information, she never did so. In addition, the appellant submitted an affidavit from the civilian attorney in which the attorney stated that he was never contacted by LT JB, but that if she had contacted him, he would have been able to provide her with evidence that AA made "numerous misrepresentations under oath" during the course of the divorce and custody proceedings.[23] Further, he asserted that AA was also the subject of a criminal contempt hearing that could have had a "significant impact on the court-martial."[24]

Finally, the appellant's second clemency submission also included a transcript of a South Carolina family court proceeding and a Goose Creek, South Carolina, police department identity theft report alleging AA opened a credit card in the appellant's name. Both the family court proceeding transcript and the police report were completed before the appellant's court-martial. The appellant forwarded the police report to LT JB prior to his court-martial, and the divorce proceeding transcript was in the possession of the appellant's civilian attorney. The appellant claims LT JB could have, but did not, use this material at his court-martial.

## II. DISCUSSION

### A. Law

We review claims of ineffective assistance of counsel *de novo. United States v. Harpole,* 77 M.J. 231, 236 (C.A.A.F. 2018). The Sixth Amendment entitles criminal defendants to representation that does not fall "below an objective standard of reasonableness" in light of "prevailing professional norms." *Strickland v. Washington*, 466 U.S. 668, 688 (1984). In order to prevail on a claim of ineffective assistance of counsel, an appellant must demonstrate both (1) that his counsel's performance was deficient, and (2) that this deficiency resulted in prejudice. *Id.* at 687.

With respect to *Strickland's* first prong, counsel are presumed to be competent and our inquiry into an attorney's representation is "highly deferential[.]" *Id.* at 689. We employ "a strong presumption that counsel's conduct falls within the wide range of professionally competent assistance." *Id.* The appellant has the heavy burden of establishing a factual foundation for a claim of ineffective representation. *United States v. Grigoruk*, 52 M.J. 312,

---

[22] *See* Clemency letter of 4 Jan 16.

[23] *Id.* at enclosure (2) ¶ 20; Affidavit of Civilian Attorney at 3.

[24] *Id.*

315 (C.A.A.F. 2000). In order to show prejudice under *Strickland*, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694. "Moreover, a verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support." *Id.* at 696.

We will not second-guess strategic or tactical decisions made by the trial defense counsel unless the appellant can show specific defects in counsel's performance that were unreasonable under prevailing professional norms. *United States v. Mazza*, 67 M.J. 470, 475 (C.A.A.F. 2009). However, a defense counsel "must perform a reasonable investigation, or make a reasonable decision that an avenue of investigation is unnecessary." *United States v. Brownfield*, 52 M.J. 40, 42 (C.A.A.F. 1999); *see also Strickland*, 466 U.S. at 691 (defense counsel have "a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary."). Strategic or tactical decisions made "after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* at 690. But "strategic choices made after less than complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Loving v. United States*, 64 M.J. 132, 142 (C.A.A.F. 2006) (internal citations and quotation marks omitted). To determine whether an investigation was thorough, "we address not what is prudent or appropriate, but only what is constitutionally compelled." *United States v. Akbar*, 74 M.J. 364, 380 (C.A.A.F. 2015) (internal citations and quotation marks omitted). The critical question, therefore, is "whether counsel made a good faith and substantive effort" to identify the witnesses and information necessary to reasonably inform their strategic and tactical decisions. *Id.* at 381. Thus, a decision by the trial defense counsel *not* to investigate will be assessed for reasonableness. *Loving*, 64 M.J. at 143.

Finally, we apply a three-part test to determine whether the presumption of competence has been overcome:

> 1. Are appellant's allegations true; if so, "is there a reasonable explanation for counsel's actions"?
>
> 2. If the allegations are true, did defense counsel's level of advocacy "fall measurably below the performance . . . [ordinarily expected] of fallible lawyers"?
>
> 3. If defense counsel was ineffective, is there "a reasonable probability that, absent the errors," there would have been a different result?

7

*United States v. Gooch*, 69 M.J. 353, 362 (C.A.A.F. 2011) (quoting *United States v. Polk*, 32 M.J. 150, 153 (C.M.A. 1991)) (alterations in original).

Turning to the case before us, we review the *Dubay* judge's findings of fact "under a clearly erroneous standard." *United States v. Wean*, 45 M.J. 461, 463 (C.A.A.F. 1997). We find support in the record for the *Dubay* judge's findings and conclude that they are not clearly erroneous. We next address—through the prism of *Strickland* and *Gooch*—those claims that we find constitute deficient performance of counsel.

**B. Deficient performance**

*1. Failure to conduct a proper investigation and adequately prepare for trial*

a. Failure to interview potential witnesses

During the course of his court-martial, the appellant was embroiled in a highly contentious divorce and custody battle with AA in state court. The divorce case and the timing and substance of AA's allegations against the appellant were inextricably linked. During the ongoing divorce and custody litigation, AA testified under oath before a family court judge and made statements to the court related to her marriage and the alleged sexual abuse. In a pleading filed in his divorce case, the appellant alleged that AA was involved in an extramarital affair with Petty Officer TF.[25] The appellant sent a copy of this pleading to LT JB the same day it was filed. Petty Officer TF lived next door to Ms. DT. When interviewed in connection with AA's allegations, Ms. DT told Naval Criminal Investigative Service (NCIS) investigators that Petty Officer TF told her that "he was in love with [AA] and that they had been intimate."[26] Ms. DT also said that Petty Officer TF—aware that Ms. DT was going to be interviewed by NCIS about the appellant's case—instructed her not to "bring up anything that [was] not necessary."[27] Petty Officer TF reminded Ms. DT "that the main focus of the investigation is on [AA's] husband for domestic and sexual assault."[28]

Ms. DT also contacted the appellant's command ombudsman[29] stating that she would like to talk to someone at the command because she was

---

[25] AE III-D at 21-22.

[26] AE IV-D at 1.

[27] *Id.*

[28] *Id.* at 1-2.

[29] "The command ombudsman is a volunteer who . . . supports the command mission by providing communications, outreach, resource referral, information, and ad-

caught in "the middle of the whole situation between [Petty Officer TF and his wife] and [the appellant and AA] . . . and is tired of hearing [Petty Officer TF] and [AA] laugh and plot together, and the wrong people take the blame."[30] Ms. DT also shared with the ombudsman that Petty Officer TF came by her house after she was interviewed by NCIS and that "she ha[d] more information she would like to share with the command."[31] Ms. DT's NCIS interview and the email she sent to the command ombudsman were provided to LT JB in discovery.

LT JB never contacted either Ms. DT or Petty Officer TF. Nor did LT JB seek to introduce evidence of AA's alleged adulterous affair with Petty Officer TF under Military Rule of Evidence 412's "constitutionally required exception, which . . . permits the admission of 'evidence the exclusion of which would violate the constitutional rights of the accused.'" *United States v. Gaddis*, 70 M.J. 248, 252 (C.A.A.F. 2011) (quoting MIL. R. EVID. 412(b)(1)(C)).[32] Whether such evidence would have ultimately been admitted by the military judge, we cannot say. Indeed, the military judge denied a previous defense MIL. R. EVID. 412 motion involving an alleged affair between AA and Petty Officer TF's wife.[33] It is not clear from the *Dubay* record, however, that LT JB understood or remembered that her original MIL. R. EVID. 412 motion—and the military judge's ruling—dealt with allegations of an adulterous affair with Petty Officer TF's wife *and not Petty Officer TF.* Indeed, it appears from

---

vocacy to and for command families." OPNAV Instruction 1750.1G CH-2, "Navy Family Ombudsman Program" of 2 Sep 14 at 3.

[30] AE V-D at 1.

[31] *Id.*

[32] *See also United States v. Ellerbock*, 70 M.J. 314 (C.A.A.F. 2011) (Evidence of the victim's extramarital affair, where evidence tended to show that the victim had a motive to fabricate the sexual assault allegations, was constitutionally required under MIL. R. EVID. 412(b)(1)(C), because exclusion of such evidence vitiated the appellant's Sixth Amendment right to cross-examine witnesses).

[33] *See* AE V. LT JB argued that evidence of the alleged adulterous relationship with Petty Officer TF's wife was relevant to show that AA had lied when she submitted answers to a family court interrogatory denying any adulterous relationship. The military judge concluded, however, that such evidence was not relevant, material, or vital to the defense. According to the military judge, the fact that AA lied in a pleading to another court, if true, was relevant to her truthfulness, but the fact that the lie was about an adulterous relationship was not. The military judge disallowed presentation of the underlying alleged adulterous relationship, but ruled that he would permit trial defense counsel to ask AA whether she lied in interrogatories relating to divorce proceedings. He based his ruling on a MIL. R. EVID. 403 balancing test, considering the conflicting evidence on the underlying alleged affair. AE XXV at 4.

the *Dubay* record, that LT JB believed she had moved the court to admit evidence of an alleged affair between AA and Petty Officer TF, when she had not.[34] Regardless, LT JB never used any of the information contained in Ms. DT's statement or in the ombudsman email.

In *United States v. Gibson*, 51 M.J. 198 (C.A.A.F. 1999), the Court of Appeals for the Armed Forces (CAAF) concluded that a trial defense team's failure to investigate information in a police report strongly suggesting that the complaining witness was not credible "was deficient within the meaning of the first prong of *Strickland*." *Id.* at 202. The CAAF reasoned that the "failure to investigate was not a tactical decision," but rather, "a serious oversight caused by their failure to carefully read the final [police] report." *Id.* Like the trial defense team in *Gibson*, LT JB did not make an informed strategic or tactical decision to forego investigating Ms. DT's statements or AA's alleged affair with Petty Officer TF. Rather, her failure was the result of inadvertence and inattention. LT JB was apparently laboring under the mistaken belief that she had already sought and been denied permission to explore AA's alleged relationship with Petty Officer TF.

We do not speculate whether the military judge would have admitted evidence of AA's alleged affair with Petty Officer TF. But certainly a "reasonably competent attorney would have realized that pursuing these leads was necessary to making an informed choice among possible defenses[.]" *Loving*, 64 M.J. at 142 (quoting *Wiggins v. Smith*, 539 U.S. 510, 525 (2003)). LT JB had a duty to "perform a reasonable investigation" into Ms. DT's statements and AA's alleged affair with Petty Officer TF, or to "make a reasonable decision that [such] an . . . investigation [was] unnecessary." *Brownfield*, 52 M.J. at 42. She did neither and as a result her performance was deficient.

        b. Failure to contact the appellant's civilian attorney

More than simply failing to interview potential witnesses, LT JB failed to contact the appellant's civilian divorce attorney. The appellant told LT JB about the nature of the divorce and custody proceedings. He asked LT JB to contact his civilian divorce attorney and provided LT JB with the contact information for his civilian divorce attorney. LT JB failed to ever contact him. Had she done so, the appellant's civilian divorce attorney could have provided

---

[34] *See Dubay* Record at 190 (discussing which motions she filed, "Yeah, I mean, Article 412 motion for, you know, [AA's] relationship with Petty Officer [TF]."); *Dubay* Record at 206 ("Q: [Y]ou made a tactical decision not to use [the NCIS statement from Ms. DT] . . .? A: Well, not only that, but I couldn't use it. The judge prevented me from asking questions about the relationship between . . . Petty Officer [TF] and AA[.]").

LT JB with information and evidence that she could have used at the appellant's court-martial to challenge AA's credibility and impeach her in-court testimony.

Notably, had LT JB contacted the appellant's civilian attorney, the attorney would have provided LT JB with a transcript from a 12 December 2013 family court hearing, in which AA allegedly made numerous false statements under oath.[35] The civil proceeding was a "rule to show cause" hearing to consider whether AA violated a family court temporary consent order by posting defaming information about the appellant on social media. During her testimony at that hearing, AA admitted to posting the material but made several dubious claims that the posts were not about the appellant.

This "show cause" hearing was continued, with the expectation that the parties would reach a divorce and custody settlement. When no settlement was reached, AA was once again ordered to appear in family court on 17 April 2014 to face potential contempt proceedings for both violating the family court's temporary consent order—that was the subject of the previous "rule to show cause" hearing—and for the dubious claims she made under oath at that previous hearing.[36] The appellant provided LT JB notice of the 17 April 2014 hearing and LT JB successfully sought a continuance of the appellant's court-martial from its original 7 April 2014 trial date to 12 May 2014, arguing:

> The alleged victim is facing the very real likelihood of being placed into custody for lying to the civilian court in South Carolina and violating a court order, which she allegedly has done on divers occasions. . . . [T]his evidence goes directly to the veracity of the alleged victim and could be used in cross-examination at trial.[37]

However, on 9 April 2014, AA's attorney notified the family court judge via email that AA would not be able to appear at the 17 April 2014 family court hearing because she had surgery scheduled that day.[38] The judge, apparently wary that AA was simply trying to avoid appearing, responded that

---

[35] *See* Clemency letter of 4 Jan 16 at enclosure (7); *Dubay* Record at 123.

[36] *See* AE XII-*Dubay* (AE XII-D) at 31 (*Dubay* Hearing Findings of Fact and Conclusions of Law); AE XXIII at 3-4.

[37] AE XIX at 3.

[38] *See* AE VI-D at 2.

he required an affidavit from AA's physician.[39] The appellant forwarded this email exchange between AA's attorney and the civilian judge to LT JB on 12 April 2014—a month before his court-martial was set to begin. Although LT JB testified during the *Dubay* proceeding that she read the email, she also testified that she "wasn't aware of the *contempt* hearing," and admits she did not reach out to the appellant's civilian attorney.[40] LT JB's testimony demonstrates that she either did not understand the nature and significance of the family court hearing, did not remember that this was the same family court "show cause" hearing that provided the impetus for her previous continuance request, or that she simply chose to ignore it. Inexplicably, LT JB never followed up with anyone to ask when the new hearing was scheduled. In short, LT JB clearly understood the importance of moving the appellant's court-martial to follow the contempt proceedings in family court. She requested and received a continuance on this basis. Yet when the family court hearing was rescheduled to take place after the appellant's court-martial, LT JB took no further action. She neither investigated the underlying facts that apparently led the family court judge to question AA's veracity, nor did she seek an additional continuance of the court-martial.

Had LT JB simply discussed the civil proceedings with the appellant's civilian attorney, she would have learned when AA's new family court hearing was scheduled and she could have then sought another continuance to delay the court-martial until after the family court hearing was completed.[41] Had she done so, the results of that hearing could have been useful to further impeach AA's credibility—just as LT JB had originally successfully argued in her prior motion for a continuance.

---

[39] *Id.* "In light of the concerns about forgery, I am going to require an affidavit from the physician that the surgery cannot be delayed, the next available date for the surgery if it is delayed and that [AA] will suffer irreparable harm from the delay of the surgery to the next available date."

[40] *Dubay* Record at 226 (emphasis added).

[41] In addition, LT JB had successfully moved the court-martial to compel production of AA's phone records. When the court-martial convened on 12 May 2014, the government had not yet received the records. Although the military judge stated he would continue the court-martial until the records were produced, LT JB ultimately decided to forego the phone records and proceed to trial because both she and the appellant did not want further delay. So even if the military judge refused to grant another continuance based solely on the rescheduled family court hearing, LT JB would have been able to leverage the government's failure to produce AA's phone records in seeking a continuance.

Applying the first two prongs of *Gooch*, we conclude that there is no reasonable explanation for LT JB's failure to contact the appellant's civilian attorney or to otherwise investigate the circumstances behind the rescheduling of the family court hearing to consider whether AA had violated the court's order and provided false testimony under oath. As a result, her advocacy fell measurably below the performance expected of fallible counsel. We make this determination in light of LT JB's asserted defense theory that AA, motivated by a contentious divorce and custody battle, fabricated her allegations against the appellant to gain an advantage in those proceedings. AA made a delayed allegation of repeated sexual abuse, for which there was no corroborating physical evidence and no confession by the appellant. AA's credibility was, therefore, the central issue in the case.

Like her failure to interview Ms. DT or Petty Officer TF, we find that LT JB's failure to contact the appellant's civilian attorney—especially after the appellant notified her via email that AA was seeking to reschedule a hearing that would examine whether or not she had violated a court's order and provided false testimony to that court—is similar. LT JB did not make a tactical decision to forego contacting him. Rather, as in *Gibson,* LT JB's failure to contact the appellant's civilian attorney was, in our view, at best a serious oversight. Aware that AA was facing a contempt proceeding and potential incarceration for lying to a civilian court, LT JB failed to investigate the factual basis for that hearing, and proceeded in her representation of the appellant without this potentially devastating impeachment evidence.

### c. Failure to contact and interview the NCIS agent

Upon reporting her allegations, AA provided a seven-page written statement to NCIS. In that statement, she never alleged the appellant used force against her during the alleged sexual assaults. Nor did she state she ever physically resisted. AA testified differently during the Article 32, UCMJ, preliminary hearing, claiming that she had, in fact, told the NCIS agent the appellant used force against her and that she resisted him. She further testified that the NCIS agent told her those statements weren't relevant.

Despite the apparent inconsistency between AA's NCIS statement and her sworn testimony at the preliminary hearing, LT JB never interviewed the NCIS agent who investigated AA's allegations. Further, she never sought his production for trial and did not call him as a witness at the court-martial. Based on AA's testimony during the Article 32, UCMJ, preliminary hearing, LT JB had reason to believe the NCIS agent's testimony would show AA provided false testimony during the Article 32, UCMJ, preliminary hearing and—if she testified consistently with her preliminary hearing testimony— would likely do so again at trial.

Indeed, at trial, AA did testify consistent with her preliminary hearing testimony. She again claimed she told the investigating agent that the appellant used force against her, that she resisted, and that the agent told her those facts were not "relevant" and omitted them from her statement.[42] Specifically, AA testified at the court-martial that she would awaken from her Ambien-induced sleep while the appellant was having sex with her, that she would try to push him off of her, but that she was unable to do so because the appellant pinned her down and was too strong for her.

LT JB attempted to impeach AA with statements she made to the investigating agent that were inconsistent with her statements at trial. LT JB pointed to the seven-page written statement AA provided to the investigating agent:

> [LT JB]: You never said that to NCIS?
>
> [AA]: Yes, I did.
>
> [LT JB]: Do you recall your statement to NCIS?
>
> [AA]: Yeah.
>
> . . . .
>
> [LT JB]: Nowhere in that entire statement do you ever say that [the appellant] would pin you down or that you attempted to push him off.
>
> [AA] Because they told me it wasn't relevant.[43]

Although AA's responses to these questions should not have been unanticipated, because LT JB had not interviewed the investigating agent, and did not request the investigating agent be produced for trial, LT JB was left powerless to perfect the impeachment by proving AA twice lied under oath. At no time during trial did LT JB ask to call the investigating agent via telephone. She did not ask the trial counsel to stipulate to the investigating agent's expected testimony. She did not ask for a continuance to attempt to interview the investigating agent.

While the record does not reveal what the NCIS agent's testimony would have been, we agree with the *Dubay* judge's conclusion that AA's "assertion"—that the NCIS agent told her the appellant's use of force and her attempts to push him off were not relevant—"is so incredible on its face that it

---

[42] Record at 102.

[43] *Id.* at 101-02.

impacts [AA's] credibility."[44] Thus, to the extent the defense's theory was to cast AA as a liar, LT JB should have been prepared to introduce evidence that AA demonstrably lied under oath during the Article 32, UCMJ, preliminary hearing and at the court-martial.[45] Such perfected impeachment could have changed the outcome of the trial. Although LT JB did try to impeach AA with the prior inconsistent statement, having an impeachment witness—the investigating agent—to directly contradict AA's in-court testimony that "they told me it wasn't relevant," would have been a prudent decision.[46]

Although LT JB attempted to frame her decision not to call the investigating agent as a tactical decision, this explanation does not comport with the timeline of events. LT JB's failure to adequately prepare a defense left her with little option to call the investigating agent at trial.

During the *Dubay* hearing, LT JB testified that after reading AA's NCIS interview, she emailed the investigating agent, who by that time had deployed to Iraq, and asked how they could best communicate. The agent responded and indicated that email would be best. However, after sending the agent a number of questions and multiple unsuccessful attempts to get him to respond, LT JB did not list him as a witness or seek to have him produced.

During the *Dubay* hearing, LT JB explained her rationale for not calling the investigating agent to testify:

> Based on the in-court demeanor of both the military judge and [AA], and my reexamining [AA] on that particular statement, I did not think the military judge found [AA's] statement to be credible, and [because the investigating agent] was in Baghdad, I did not call him to testify to impeach [AA's] statement.[47]

"A trial defense counsel's decision on whether to call a witness is a tactical decision," *Akbar*, 74 M.J. at 390 (citations omitted), and tactical decisions made by counsel will not generally be second-guessed on appeal. *Mazza*, 67

---

[44] AE XII-D at 28.

[45] Impeachment would likely have been proper under MIL. R. EVID. 608(b) for the apparent lie under oath during the Article 32, UCMJ, preliminary hearing, as a prior inconsistent statement (failing to allege force and resistance in her initial report) and proper impeachment by contradiction (provided the investigating agent could testify that AA never alleged force or that she resisted in her interview and that he denied telling AA to omit these statements because they were not "relevant").

[46] Record at 102.

[47] Affidavit of LT JB of 22 Dec 16 at 4.

M.J. at 475. As we noted earlier, however, tactical decisions made after "less than [a] complete investigation are reasonable only to the extent that reasonable professional judgments support the limitations on investigation." *Loving*, 64 M.J. at 142 (internal citations and quotation marks omitted).

Here, LT JB's pre-trial preparation was deficient long before AA testified at trial. Discovery and witness production requests were due prior to trial and LT JB never requested that the investigating agent be produced. Moreover, LT JB had never talked to the investigating agent. Preparation had to have come before the 12 May 2014 trial date and certainly before LT JB's in-court observation that the military judge's "demeanor" indicated to her that he did not find AA's testimony credible. Although we recognize that the investigating agent was less than cooperative and failed to answer LT JB's e-mailed questions,[48] LT JB did not attempt to use any other reasonable means—the trial counsel, the NCIS chain of command, or the military judge—to compel the investigating agent's response to the defense questions or to submit to an interview.

By resting her case without presenting any evidence to contradict AA's testimony on critical inconsistencies in her claims on the most serious charges in the case, LT JB left untouched a critical avenue of impeachment. Indeed, if the investigating agent had testified that AA never claimed that the appellant used force to pin her down, that AA never claimed she physically resisted, that he never told AA that force was not relevant, and that he never told AA to omit any reference to the appellant using force from her statement, this evidence would have directly refuted AA's in-court testimony and would have permitted LT JB to forcefully argue that AA twice perjured herself on the witness stand. Such evidence could have made a significant difference to the military judge when he assessed AA's credibility—which was paramount in this case given the lack of corroborating evidence. We conclude LT JB's pre-trial preparation here fell "measurably below the performance ordinarily expected of fallible lawyers[.]" *Gooch*, 69 M.J. at 362.

*2. Failure to effectively impeach AA*

Prior to his court-martial, the appellant forwarded LT JB a Goose Creek, South Carolina, police report indicating that AA was arrested for identity fraud on 4 April 2014, after allegedly attempting to open a credit card in the appellant's name.[49] The Goose Creek Police Department determined that the

---

[48] *See Dubay* Record at 116 ("I try to avoid speaking to defense counsel pretrial."); *Id.* at 119 ("[MJ]: So if I were a defense attorney and I left you a message to return my call, would you return my call? [the investigating agent]: No, sir, I would not.").

[49] *See* Clemency letter of 4 Jan 16 at enclosure (5.c.).

application for credit came from an IP address issued to AA, and located at AA's address. AA denied the allegations to the police, asserting improbably that the appellant had possibly hacked into her home wireless network and "done it himself in order to get back at her."[50] Alternatively, AA theorized that she had filled out an application in her husband's name after taking Ambien, and did not remember doing it. In a subsequent phone conversation with the Goose Creek Police Department, AA provided yet another alternative, explaining that one of the appellant's friends—who resided in Louisiana—"would be able to hack into a computer."[51]

This evidence *suggests* AA committed a crime of dishonesty; that she committed that crime against the appellant; that she was confronted by police and falsely denied that crime; that she falsely accused her husband of the very crime she was accused of committing; and that she blamed her actions on her use of Ambien. That AA gave three different, implausible explanations further undercuts her credibility and further suggests she committed identity fraud against the appellant. These facts could have been used to devastating effect against AA to establish her untruthfulness and bias against the appellant.[52]

LT JB never questioned AA about these allegations or otherwise sought to call the interviewing detective as evidence of bias pursuant to MIL. R. EVID. 608(c).[53] Despite the damaging evidence developed by the Goose Creek Police Department that AA committed identity fraud, and AA's dubious explanation that the appellant or a friend of his "hacked" into her home wireless network, LT JB's only questions related to the Goose Creek investigation concerned the side effects of Ambien and AA's assertion that she might have filled out the credit application after having taken the drug. LT JB's failure to fully develop these allegations against AA and to effectively impeach her with this

---

[50] *Id.* at Bates No. 00363.

[51] *Id.* Goose Creek police contacted the friend, who explained that he was not a hacker, "wouldn't know how to hack into a wireless network," and had only been to South Carolina once in April 2013. *Id.* at Bates No. 00364.

[52] It is not for this court to say whether AA committed this offense, and the court does not draw this conclusion. However, the record shows trial defense counsel had a good faith basis to pursue relevant and admissible lines of inquiry, which the trial defense counsel failed to pursue.

[53] "Bias, prejudice, or any motive to misrepresent may be shown to impeach the witness either by examination of the witness or by evidence otherwise adduced." MIL. R. EVID. 608(c).

information falls "measurably below the performance ordinarily expected of fallible lawyers[.]" *Gooch*, 69 M.J. at 362.

## C. Prejudice

Having found that LT JB's representation of the appellant was deficient, we next test for prejudice. That is, is there a "reasonable probability that, absent the errors," there would have been a different result. *Polk*, 32 M.J. at 153 (citations omitted).

### 1. Cumulative error

In *United States v. Dollente*, 45 M.J. 234 (C.A.A.F. 1996), the CAAF found that a combination of evidentiary errors cumulatively affected the case and prejudiced the appellant. The court explained: "although individually each error in this case does not warrant reversal, the combined effect of these . . . errors was so prejudicial so as to strike at the fundamental fairness of the trial." *Id.* at 236 (internal citation and quotation marks omitted). While *Dollente* did not involve allegations of ineffective assistance of counsel, the CAAF has found that it is appropriate "to consider whether defense counsel's conduct of the trial as a whole might have been defective within the meaning of *Strickland*, even though individual oversights or mistakes standing alone might not satisfy *Strickland*." *Loving*, 41 M.J. at 252 (internal citation omitted).

### 2. Analysis

This was a close case. The government's proof relied almost exclusively on the credibility of AA. Thus, any evidence, either admitted extrinsically or used to impeach AA's testimony, was pivotal to an effective defense. LT JB's failure to properly investigate and pursue evidence beneficial to the appellant's defense—whether from Ms. DT, Petty Officer TF, the appellant's civilian attorney, the investigating NCIS agent, or the Goose Creek Police Department—"cannot be viewed as harmless, non-prejudicial error." *Gibson*, 51 M.J. at 201.

Indeed, had LT JB simply established communication with and coordinated her efforts with the appellant's civilian divorce attorney, as the appellant repeatedly requested, LT JB would likely have been able to continue the court-martial until such time that the civilian family court proceedings—where AA was facing potential contempt charges—were completed. She could have then used the results of those proceedings and any testimony from AA to impeach her at the court-martial. Likewise, evidence from the Goose Creek Police Department would have severely undermined AA's credibility, and testimony from the investigating agent would have likely proved that AA lied under oath at the preliminary hearing and court-martial.

The government argues that even assuming LT JB had pursued all of the evidence that might have impacted AA's credibility, "none of the witnesses or evidence" would have rebutted the appellant's aunt's testimony admitted under MIL. R. EVID. 404(b) to show the appellant's motive, plan, or intent.[54]

The MIL. R. EVID. 404(b) testimony regarding the 2009 Connecticut incident, as described by the appellant's aunt, was equally relevant to the allegations that the appellant sexually assaulted AA in Hawaii, and yet the military judge acquitted the appellant of that specification. Despite AA's testimony that the appellant had sex with her after she had taken Ambien during the charged timeframe—after her long-awaited doctor's appointment on 28 Jun 2012 and before she and the appellant transferred on 30 June 2012—the military judge was not convinced beyond a reasonable doubt of the appellant's guilt. So, although we agree the MIL. R. EVID. 404(b) testimony was important to the government's case, AA's credibility was paramount as she provided the only direct evidence of the charged offenses. There were no other witnesses, no medical evidence, and no admissions or other statements from the appellant. The government's case rested predominately upon the credibility of AA's testimony.

AA's credibility was already in question after LT JB effectively impeached her regarding her allegations that the appellant pointed a gun at her during his suicidal ideation. The military judge acquitted the appellant of aggravated assault. The two acquittals in this case reveal the vital role AA's credibility played in the military judge's findings. To be sure, in finding the appellant guilty, the military judge specifically concluded that AA "never consented to sex acts while on Ambien," that AA told the appellant "to not have sex with her while she was on Ambien," and that AA and the appellant discussed the effects of Ambien on several occasions.[55] All of these findings—based solely on AA's testimony—were critically important to the military judge's guilty finding. A reasonably thorough investigation by LT JB during her pretrial preparation would have garnered even more evidence to further erode AA's credibility.

Although any one of LT JB's errors, standing alone, may not clear the high hurdle established in *Strickland,* their cumulative effect "undermine[s] our confidence in the outcome." *Strickland*, 466 U.S. at 694. Given that the military judge's finding of guilty was only "weakly supported by the record[,]" we find that there is a reasonable probability that any further erosion of AA's credibility through competent investigation and cross-examination would

---

[54] Appellee's Supplemental Answer of 12 Apr 18 at 16.

[55] AE XXXVIII at 3.

have changed the result of the court-martial. *Id.* at 696. Accordingly, we conclude that the appellant was not afforded effective assistance of counsel as guaranteed by the Sixth Amendment.

### III. CONCLUSION

The findings and sentence are set aside, and the record is returned to the Judge Advocate General of the Navy for remand to an appropriate CA with authority to order a rehearing.

Senior Judge FULTON and Senior Judge PRICE concur.

FOR THE COURT

RODGER A. DREW, JR.
Clerk of Court