# UNITED STATES ARMY COURT OF CRIMINAL APPEALS

Before
FLEMING, PENLAND, and SCHLACK'
Appellate Military Judges

**UNITED STATES, Appellee**
v.
**Specialist ROY A. WORDLAW**
**United States Army, Appellant**

ARMY 20230235

Headquarters, 25th Infantry Division and U.S. Army Hawaii
Michael E. Korte, Military Judge
Colonel Christopher E. Martin, Staff Judge Advocate

For Appellant: Captain Stephen R. Millwood, JA (argued); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA; Captain Stephen R. Millwood, JA (on brief); Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA; Major Beau O. Watkins, JA; Captain Stephen R. Millwood, JA (on reply brief); Colonel Philip M. Staten, JA; Lieutenant Colonel Autumn R. Porter, JA; Major Robert D. Luyties, JA; Major Beau O. Watkins, JA; Captain Stephen R. Millwood, JA (on specified issue brief); Colonel Philip M. Staten, JA; Major Beau O. Watkins, JA; Captain Stephen R. Millwood, JA (on specified issue reply brief).

For Appellee: Captain Anthony J. Scarpati, JA (argued); Colonel Richard E. Gorini, JA; Major Lisa Limb, JA; Captain Anthony J. Scarpati, JA (on brief); Colonel Richard E. Gorini, JA; Major Marc B. Sawyer, JA; Captain Anthony J. Scarpati, JA (on specified issue brief).

12 March 2025

------------------------------------
MEMORANDUM OPINION
------------------------------------

*This opinion is issued as an unpublished opinion and, as such, does not serve as precedent.*

SCHLACK, Judge:

An enlisted panel convicted appellant, contrary to his pleas, of two specifications of sexual assault and one specification of assault consummated by a battery in violation of Articles 120 and 128, Uniform Code of Military Justice, 10

U.S.C. §§ 920, 928 (2019) [UCMJ]. The military judge sentenced appellant to a dishonorable discharge and confinement for ten years. Appellant raises five assignments of error, one of which—ineffective assistance of counsel—merits discussion and relief.[1]

## BACKGROUND

Appellant and the victim were in an intimate sexual relationship for approximately seven months. Appellant apparently ended the relationship on 18 July 2020 at or near Dillingham Airfield in Hawaii. The airfield, which was a remote location, was the couple's "usual spot" to have consensual sex, often in the victim's Sports Utility Vehicle (SUV) and sometimes on the airfield's beach. What happened in the SUV while parked near the airfield on 18 July, prior to appellant ending the relationship, was the contested issue at trial.

In the days leading up to the alleged assault, the appellant was in the field, training with his unit. While away, he and the victim "sexted" each other about the sexual activities they wanted to perform on one another. During one such conversation on 17 July, appellant told the victim he was going to have anal sex with her in her SUV or on the beach. In the first set of messages, which were later admitted without objection at trial as Prosecution Exhibit (PE) 1, the victim rejected appellant's demand to have anal sex, texting: "[e]asy babe [laughing emoji] I'm down with f****** hard but easy on the ass lol." The victim's reluctance to have anal sex was also reflected in another string of messages which ultimately became PE 2, also admitted without objection: "Omg babe. You know no ass in the car." This response angered appellant, and a text argument followed, ultimately resulting in the victim texting: "Well [sic] do but I'll lead it as last time" and "[w]e'll be doing *everything* we talked about. Don't worry. I'm all yours." (emphasis added). The government asserted PE 2 did not stand for the proposition that the victim was consenting to anal sex in the SUV, just that she was agreeing to stop the argument.

The conversation continued into 18 July—the day appellant returned from the field and the day of the sexual assault. In the hours before meeting appellant, the victim apologized for "killing the vibe" during the previous conversation about anal sex on 17 July and stated, "[w]e will make all that happen and I'm so horny for you still. I got you babe." The 18 July texts were not offered as exhibits at trial.

Before meeting appellant on 18 July, the victim went to a party, where she drank alcohol and vomited. Fearing the victim was too intoxicated to drive, the party's host contacted appellant to come get her. Appellant got a ride to the party

---

[1] We have given full and fair consideration to the matters personally raised by appellant pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982) and determine they merit neither discussion nor relief.

and then drove himself and the victim in her SUV for approximately an hour from the party to the airfield. The victim testified she could not remember the drive to the airfield or the subsequent ride back to Schofield Barracks. She testified to having only fragmented memories of what transpired while parked near the airfield. She testified to remembering that appellant hit her in the face with his hand and called her derogatory names while sitting next to her, and she next remembered appellant penetrating her vulva with his penis without her consent in the backseat of her vehicle but did not remember how she got into the back of her SUV. Finally, she remembered appellant penetrating her anus with his penis without her consent as she cried. The next thing the victim recalled was appellant getting out of her SUV at the Schofield Barracks gate, at which point she drove herself home.

The following day, the victim told several friends she was sexually assaulted by appellant in the backseat of her SUV. Within the next few days, the victim underwent a sexual assault forensic examination (SAFE). The sexual assault medical forensic examiner (SAMFE) noted the victim's discolored cheeks, pelvic tenderness, several superficial perineal and anal lacerations, and a laceration on her posterior fourchette. Within the same week, the victim reported being sexually assaulted to the Honolulu Police Department. In her reports, she acknowledged the airfield was a "usual spot" for the couple to engage in sexual acts, and she and appellant intended, as indicated in their "sexting" messages, to have sexual intercourse in her SUV on 18 July. The fact the remote airfield was the "usual spot" for sexual activity between appellant and the victim was not offered at trial by defense in support of a consent or mistake of fact as to consent theory.

After further investigation, charges were preferred against appellant. Captain (CPT) MD and CPT AT were detailed as appellant's trial defense counsel. At some point during pretrial preparations, the defense counsel settled on a theory that "[i]nstead of arguing she was intoxicated to a particular level, . . . she remembered what happened and was making false allegations to get back at [appellant] for emotionally stringing her along and then ending their relationship.[2]

As appellant's case progressed, the military judge issued a pretrial order that set deadlines for the defense to request expert assistance and for both parties to file motions. Some of the evidence available to the defense indicated the victim would testify, as she ultimately did, that her pre-assault alcohol consumption affected her memory. Nonetheless, defense counsel continued onward with their chosen theory and did not request expert assistance from a toxicologist or psychologist familiar with the effects of intoxication on memory or perception.

---

[2] Trial defense counsel's theory of the case was provided in their affidavits ordered by this court.

Assistant defense counsel stated a "[m]istake of fact as to consent was something that [they] considered, but . . . decided that the revenge theory was . . . [the] best and most believable theory to put forward." The lead defense counsel stated he thought "the best strategy was a theory of actual consent or, if not, mistake of fact as to consent." Notwithstanding the evidence indicating memory impairment, the defense counsel forwent requesting expert assistance because "based on the theory of the defense, [lead defense counsel] believed that [defense] did not have enough to justify the need for expert consultation or testimony in forensic psychology or toxicology." The lead defense counsel also said that his belief was such because the "alleged victim . . . remembered and was capable of communicating consent or lack of consent at the time of the alleged offenses." Conversely, the assistant defense counsel stated he was "concerned by the decision not to use experts."

The government provided defense notice pursuant to Military Rule of Evidence [Mil. R. Evid.] 404(b) of their intent to offer evidence of the appellant's plan to control and dominate the victim. Defense filed a motion to exclude such evidence, attaching various text messages between appellant and the victim, clearly discussing sexual activity in the past, and they still did not file a Mil. R. Evid. 412 motion.[3]

Beyond the text messages, appellant also gave his defense team extensive details regarding prior consensual sexual encounters between himself and the victim involving vaginal sex in the victim's SUV at the airfield, prior anal sex, and consensual sexual activity that would appropriately be characterized as "rough sex." Despite knowing this information and having the text evidence of what seemed to be the victim's acquiescence to anal sex *in the SUV* the same day as the sexual assault, appellant's trial defense team did not provide notice or file a motion under Mil. R. Evid. 412 to support a theory of consent or mistake of fact as to consent.

Lead defense counsel addressed the decision to not file a Mil. R. Evid. 412 motion, stating: "at one point I believed that we needed to file an MRE 412 motion" but the assistant defense counsel believed "if the texts were leading up to the charged offenses [on 18 July] . . . an MRE 412 motion was [not] necessary because the rule is only for 'other' sexual acts," not the charged sexual acts. CPT MD ultimately agreed and concluded that the messages "were not 'other sexual behavior,'

---

[3] Attached to the government's pleading were thirty-five pages of messages. As discussed below, these messages were reduced to the nine pages in PE 1 and 2, which were ultimately admitted at trial and included texts about prior sexual behavior between the victim and appellant, which was subject to the requirements of Mil. R. Evid. 412. Prior to offering evidence under Mil. R. Evid. 412, the movant must "at least 5 days prior to entry of pleas," provide notice "describing the evidence and stating the purpose for which it is offered." Mil. R. Evid. 412(c)(1)(A).

[and] they were not inadmissible under MRE 412." As to any other texts prior to those "leading up to 18 July" regarding sexual activity, counsel believed they contained content that was possibly negative to appellant.

Regarding the previous sexual encounters, including those at the airfield, counsel did not believe such evidence was relevant because "[t]he issue . . . was whether [the charged] sexual act [*sic*] at the beach was consensual or not," not "whether [appellant and the victim] were sexually active, or if they had engaged in sex at the beach before." Focused on the other text messages themselves rather than the facts of consequence therein, defense counsel believed seeking admission of the text messages in support of a consent or mistake of fact as to consent theory would allow the government to elicit other non-consensual actions by their client.[4] As discussed in their affidavits, their concern was the other messages would somehow undermine their theory of the case—that the victim was seeking retribution for appellant ending the relationship. Defense counsel expressed concern that discussing prior consensual sex, anal or vaginal, using text messages might paint appellant as "an unfaithful manipulator;" an endeavor the government successfully achieved nonetheless using Mil. R. Evid 404(b).

The victim testified early in the government's case. During her examination, the trial counsel admitted PE 1 and 2, totaling nine pages of text messages from 17 July, while asserting they "fairly and accurately reflect[ed]" the conversation between appellant and the victim on the day before the assault. Carved out of the messages, however, were any texts indicating appellant and the victim had previously had sex in the SUV near the airfield. Defense counsel made no objection to PE 1 or 2.

On cross-examination, defense counsel used the 17 July "I'll lead it as last time" statement to get the victim to acknowledge she seemingly agreed to engage in anal sex. Without filing a Mil. R. Evid. 412 motion, however, defense counsel was unable to connect that concession to either a consent or a mistake of fact theory of the case. Specifically, they were unable to offer evidence that the victim and the appellant planned to have sex on 18 July; that she engaged in consensual sexual acts with appellant at the airfield in her SUV routinely; that she and appellant had anal sex before—albeit under different conditions in the past, conditions she seemingly

---

[4] For instance, appellant allegedly: (1) removed the victim's birth control device without her consent; (2) recorded and broadcasted his and the victim's prior sexual encounters without her knowledge or consent; and (3) ignored the victim's verbal manifestation of non-consent, and became physically aggressive with the victim, until she acquiesced on prior occasions. Notably, the government did not provide notice of their intent to offer either category of evidence under Mil. R. Evid. 404(b) or 413. Despite this, evidence of appellant removing the victim's birth control device and other mentions of sexually abusive behavior were admitted at trial.

abandoned in the text message offered by the government and she therefore consented to sex (and was angrily lying at trial) or the appellant mistakenly believed she consented to sex on 18 July (and did so under circumstances she could not recall due to her impairment).[5]

The panel posited multiple questions to the victim, including whether she and appellant had ever engaged in sex in her car at the beach and whether sex with appellant had ever been aggressive. The government objected to these questions, but defense counsel did not. The military judge did not ask either question, citing Mil. R. Evid. 412. Despite having a clear indication that this information was important to the panel, defense counsel did not, at this point, move to admit evidence of the prior consensual sexual relationship under Mil. R. Evid. 412.

Another panel member asked the victim whether she and appellant had made any plans the evening of the assault. She denied any concrete plans, and the defense did not confront her with any 18 July text messages wherein she indicated she was going to "make all [of appellant's sexual desires] happen" that night or with the report she made to local law enforcement wherein she articulated her intent to have sex with appellant that evening.

The government called the victim's close friend, who described the victim's outcry the day after the assault. According to this witness, the victim was clearly upset when they spoke. The government did not use this witness to introduce the victim's post-assault statements. On cross-examination, however, the defense elicited numerous hearsay statements bolstering the victim's account:

> ADC: Is it true that you got a text message from [the victim] that said, "I think something bad happened last night?"
>
> WIT: That's true.
>
> ADC: And according to [the victim], they had anal sex in her car that night? Is that true?
>
> . . .
>
> WIT: Yes. That's true.
>
> ADC: And she told you that [appellant] punched her in the face?

---

[5] When trial defense counsel tried to ask the victim about her previous discussions with appellant about anal sex, the military judge sustained a government objection under Mil. R. Evid. 412.

> WIT: Yes.

> ADC: And she was trying to defend herself, but couldn't?

> WIT: As far as I remember. Yes.

Though defense highlighted minor inconsistencies in the victim's story, the cross-examination primarily reinforced the government's case.

The panel had questions for this outcry witness implicating Mil R. Evid. 404, 412, and 413. Without objection from the parties, a member asked whether the victim had ever spoken with the witness "about any physical or sexual abuse" involving appellant:

> MJ: A clarification question. Did [the victim] talk to you about any physical or sexual abuse?

> WIT: Yes, she did.

The military judge continued:

> MJ [to member]: Do you wish for her to elaborate?

> [Member]: Yes, sir.

> MJ [to WIT]: Please elaborate.

> . . .

> WIT: So just for my clarification, we're talking about especially the incident on that night, right? That was your question, about the sexual abuse?

> [Member to WIT]: Or any other time?[6]

---

[6] The defense's continued failure to object at this point warrants separate emphasis. The government did not provide notice under Mil. R. Evid. 413 to offer evidence of other sexual misconduct, nor did the government file a motion under Mil. R. Evid. 412 to offer other sexual behavior to demonstrate non-consent on 18 July. Further, defense counsel believed, as evidenced in their affidavits, there was other, unfavorable evidence suggesting additional sexual misconduct occurred or, at the

(continued . . . )

WIT: Or any other time. I'm going to answer. I don't mind. It's – yes, she did. She said – or she's said to me that it's like – a lot of times it's been really rough sex and that it's always been a topic that like from [appellant] doing, you know, anal sex and everything – is basically what's supposed to happen. And also, in that night, like, she stated to me that she was crying and that it hurts her and she's maybe trying to, you know, how do you say – trying to push him away, but she couldn't, because, I mean she was so intoxicated also. She was not able to do so.

During this "elaboration" of hearsay statements by the witness, invited by the military judge, the defense finally objected "to that part" of the witness's answer.

However, the record is unclear what "that part" was, leaving this court ill-positioned to evaluate the objection. Additionally, the military judge did not clarify the objection, rule on it, or later provide a limiting instruction regarding this testimony. Further, this answer opened the door to evidence of the victim consenting to rough sex in the past, but because defense failed to file a Mil. R. Evid. 412 motion, they were precluded from eliciting evidence of prior consensual rough sex, anal or otherwise, to argue consent or mistake of fact as to consent on 18 July or to impeach the victim's in-court testimony.[7] Beyond the pretrial failure to file a motion, the defense still did not make a motion under Mil. R. Evid. 412 after this exchange.

The remainder of the government's case-in-chief centered on evidence corroborating the victim's account, including the SAMFE's testimony about the victim's injuries. Without objection, the SAMFE also recounted the victim's narrative of sexual assault to the panel. According to the SAMFE, the injuries were consistent with the victim's account of the assault but were *also* consistent with consensual sexual activity.[8] Additionally, the SAMFE testified the victim's anal

---

( . . . continued)
very least, evidence that impugned appellant's character. So, while it is possible the member's written question initially referenced the 18 July incident and not other, uncharged conduct, any reasonable defense counsel, similarly situated, would have objected after it became clear the member was asking about other uncharged conduct.

[7] Messages provided to defense counsel by appellant included the victim describing how she wanted and enjoyed what could be characterized as "rough sex."

[8] Puzzlingly, the SAMFE also testified she observed bruising under the eyes of the victim, consistent with her being struck in the face by appellant, but she failed to note those injuries on her report.

injuries could have also been caused by excessive wiping, which the victim reported.[9]

By the time the government rested its case, the panel had heard from the victim that despite her alcohol-impaired memory, she was physically and sexually assaulted. The panel also heard, over an unaddressed objection, that appellant had sexually abused the victim before—including anally. The panel also had out of court text messages between the appellant and the victim wherein she manifested non-consent to anal sex in her vehicle and received appellant's hostile response. The defense sought to undermine the victim's credibility by highlighting minor inconsistencies between her in-court testimony and her prior statements, introducing a post-assault message wherein she apparently tried to reunite with appellant, and having her acknowledge she did not report prior physical "abuse" to local law enforcement when interviewed.

During the defense case-in-chief, appellant did not testify. Knowing through the discovery process that swabs collected during the SAFE produced no or insufficient male DNA, defense called a DNA forensic examiner to testify accordingly. Then, on cross-examination, the examiner acknowledged appellant's semen was found on a towel inside the SUV. On redirect, the defense asked the witness whether the semen could have originated from a night before 18 July to which the witness responded "yes." The DNA examiner also testified no DNA had been found on the dress worn by the victim the night of the assault. However, because the defense did not file a Mil R. Evid. 412 motion referencing any *prior* sexual activity between the parties in the SUV, the effect of this "possibility" testimony was minimal. And yet, defense still did not move to offer evidence of relevant prior consensual sex in the SUV pursuant to Mil R. Evid. 412.

Because some evidence of prior sexual behaviors between the victim and appellant came out at trial, defense counsel requested the military judge give the members the Mil. R. Evid. 412 instruction.[10] The military judge declined.

---

[9] During cross-examination, the victim said she was experiencing diarrhea the week leading up to the assault.

[10] As is relevant, the instruction sought by defense, "7-14. Past Sexual Behavior of Sex Offense Victim" reads: "Evidence has been introduced indicating that [the victim] has engaged in past acts of (specify the specific instances of past sexual behavior) with (the accused). This evidence should be considered by you (on the issue of whether [the victim] consented to the sexual act(s) with which the accused is charged) (on the issue of whether or not the accused was the source of (semen)(and)(injury to the victim))."

In closing the government argued appellant was manipulative and abusive towards the victim, and her apparent acquiescence in the text messages fell short of consent. Incapable of adequately responding to this argument because of the failure to make a motion under Mil. R. Evid. 412, defense could not argue what impact, if any, appellant's prior sexual relationship with the victim had on his state of mind, or on the issue of actual consent on 18 July.

Shortly after trial, CPT MD wrote a memorandum for record (MFR) detailing the decision not to file a motion seeking to determine the admissibility of appellant's sexual relationship with the victim. CPT MD wrote "[t]he only evidence that MRE 412 would have applied to was that the [appellant] and the alleged victim (AV) had consensual *anal* sex on limited occasions before the incident in question." (emphasis added). Because the prior occasions were distinct from the incident charged, CPT MD reasoned such evidence was more harmful than beneficial as "[t]he Government would have argued that the [appellant] knew that the AV would not consent to anal sex in the car, which was in fact the case in the text messages, and which probably was the case in the car on the night of the incident."

Appellant now asserts ineffective assistance of counsel because his defense team neither tried to introduce evidence of his and the victim's prior consensual sexual activity for a permissible Mil. R. Evid. 412 purpose nor sought expert assistance related to the victim's intoxication.

## LAW AND DISCUSSION

### A. Ineffective Assistance of Counsel

"In all criminal prosecutions, the accused shall enjoy the right to . . . have the [a]ssistance of [c]ounsel for his defense." U.S. Const. amend. VI. This is the bedrock for assessing any claim of ineffective assistance of counsel. *E.g.*, *Strickland v. Washington*, 466 U.S. 668, 685 (1984). This court reviews claims of ineffective assistance of counsel de novo. *United States v. Furth*, 81 M.J. 114, 117 (C.A.A.F. 2021). "To prevail on an ineffective assistance claim, the appellant bears the burden of proving that the performance of defense counsel was deficient, and that appellant was prejudiced by the error." *United States v. Captain*, 75 M.J. 99, 103 (C.A.A.F. 2016) (citing *Strickland*, 466 U.S. at 698). "[I]n assessing an ineffective assistance claim, we can analyze *Strickland*'s performance and prejudice prongs independently, and if appellant fails either prong, his claim must fail." *United States v. Soler*, ARMY 20210017, 2022 CCA LEXIS 268, at *6-7 (Army Ct. Crim. App. 9 May 2022) (mem. op.) (citing *Strickland*, 466 U.S. at 687). While a singular failure or omission can result in a case being set aside for ineffective assistance, "trial defense counsels' conduct, examined in its totality, [can] constitute[] ineffective assistance of counsel even if individual oversights or missteps d[o] not independently rise to that level." *United States v. Akbar*, 74 M.J.

364, 392 (C.A.A.F. 2015) (citing *United States v. Loving*, 41 M.J. 213, 252 (C.A.A.F. 1994)).[11]

### 1. Deficient Performance

To establish deficient performance, appellant must show "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Counsel are presumed to be competent. *United States v. Gooch*, 69 M.J. 353, 361 (C.A.A.F. 2011). To determine whether that presumption has been overcome, courts consider, *inter alia*: "1. Are appellant's allegations true; if so, 'is there a reasonable explanation for counsel's actions'? [and] 2. If the allegations are true, did defense counsel's level of advocacy 'fall measurably below the performance . . . [ordinarily expected] of fallible lawyers?'" *United States v. Palik*, 84 M.J. 284, 289 (C.A.A.F. 2024) (citing *Gooch*, 69 M.J. at 362) (third prejudice prong omitted) (alterations in original).

In evaluating performance, courts "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690. Strategic choices made by counsel "after thorough investigation of law and facts . . . are virtually unchallengeable." *Id..* In other words, this court will not "dissect every move of these trial defense counsel and then impose our own views on how they could have handled certain matters differently and, perhaps, better." *Akbar*, 74 M.J. at 371. However, "[a]n attorney's ignorance of a point of law that is fundamental to his case combined with his failure to perform basic research on that point is a quintessential example of unreasonable performance under *Strickland*." *Hinton v. Alabama*, 571 U.S. 263, 274 (2014).

"When a claim of ineffective assistance of counsel is premised on counsel's failure to make a motion . . . , an appellant must show that there is a reasonable

---

[11] To assess for cumulative error requires:

> considering each such claim against the background of the case as a whole, paying particular weight to factors such as the nature and number of the errors committed; their interrelationship, if any, and combined effect; how the [trial] court dealt with the errors as they arose (including the efficacy-or lack of efficacy--of any remedial efforts); and the strength of the government's case. The run of the trial may also be important; a handful of miscues, in combination, may often pack a greater punch in a short trial than in a much longer trial.

*United States v. Dollente*, 45 M.J. 234, 242 (C.A.A.F. 1996) (internal citation omitted) (alterations in original)

probability that such a motion would have been meritorious." *Palik*, 84 M.J. at 289 (internal citations and quotations omitted). Evidence of a victim's prior sexual behavior or predisposition is generally not admissible, unless offered *inter alia* "by the accused to prove consent," or if constitutionally required. Mil. R. Evid. 412(a)-(b); *United States v. St. Jean*, 83 M.J. 109, 113 (C.A.A.F. 2023).

The circumstances of this case, when considering the applicable legal standards, indicate defense counsel were deficient in failing to seek admission of evidence of the victim's prior sexual behavior with appellant pursuant to Mil. R. Evid. 412. Specifically, the defense failed to seek a ruling on admissibility of evidence for: (1) the victim's prior sexual behavior with appellant near the airfield; (2) certain evidence of "sexting" between appellant and the victim in the days leading up to the alleged sexual assault; and, (3) prior consensual "rough sex," including consensual anal intercourse, to support either a consent or mistake of fact as to consent theory in the case.

Trial defense counsel were well aware of appellant's sexual history with the victim, including but not limited to the fact that the couple routinely engaged in consensual sexual acts near the airfield, in her SUV, prior to the alleged assault. And, because the government filed a Mil. R. Evid. 404(b) motion, defense counsel knew the government sought to introduce certain text messages between appellant and the victim that alluded to prior anal sex but purported to show the victim's non-consent to such activity.

Without filing a motion to counter the government's narrative, defense counsel permitted the government to paint a picture wherein even vaginal intercourse near the airfield in the victim's SUV was outlandish and unusual and thus without consent. We also pause to note that while filing a Mil. R. Evid. 412 motion does not *require* defense to offer the admissible evidence at trial, it does ensure counsel has the option to do so, and it preserves counsel's ability to request the military judge reconsider any prior ruling as to inadmissibility of the evidence as the exigencies of trial unfold.

We acknowledge trial defense counsel's argument, stated in affidavits, that the military judge would have likely limited the extent to which defense was able to pry into such matters in open session.[12] However, evidence of prior vaginal intercourse

---

[12] We note, however, that this rationale differed from CPT MD's 1 May 2023 MFR, in which he wrote: "The only evidence that MRE 412 would have applied to was that the [appellant] and the alleged victim (AV) had consensual anal sex on limited occasions before the incident in question." This is a misunderstanding of the law applied to the facts in this case as Mil. R. Evid. 412 applied to all prior sexual behavior of appellant and the victim. This contributes to our finding of deficient performance.

in the victim's SUV at the airfield was reasonably likely to have been admissible under Mil. R. Evid. 412(b)(2). *See, e.g., United States v. Anderozzi*, 60 M.J. 727, 739 (Army Ct. Crim. App. 2004). While the acts themselves were not particularly distinct, the isolated nature of the location—and the reason for going to their "usual spot"—were. Alternatively, when considered alongside the text messages exchanged between appellant and the victim while appellant was in the field, such evidence would likely have been admissible under Mil. R. Evid. 412(b)(3) as well.

Defense counsel also claim they did not seek to offer "sexts" out of fear that some of it could have painted appellant in an unflattering light; this is not objectively persuasive. Much of the evidence the government disclosed and admitted under Mil. R. Evid. 404(b) accomplished that effect. To the extent defense counsel were concerned about other unadmitted text messages demonstrating their client's "manipulation" of the victim, we are not persuaded such evidence would have been admissible given the limited nature of the government Mil R. Evid. 404(b) notice.[13] We find it concerning that defense counsel seem fixated on the text messages themselves rather than the underlying sexual behaviors the texts memorialized. Said plainly, assuming admissibility of certain sexual behavior(s), nothing required defense to admit the actual text messages. Evidence of such behaviors could have been elicited through examination of the victim or via other means. Further, such an excuse is inconsistent with defense's performance at trial, where the defense expressed "no objection" to the member's question that clearly called for a response inviting evidence plainly covered by Mil. R. Evid. 412, 413, and/or 404. In short, defense counsel's purported concern materialized anyway, and their failure to file a Mil. R. Evid. 412 motion did nothing but preclude them from combating the government's narrative.

We also find that counsel's explanation is inconsistent with their decision to introduce ambiguous DNA evidence at trial. When defense called the DNA examiner to testify, counsel was aware that the examiner tested a towel found in the SUV and the towel had appellant's semen on it. Because defense counsel failed to file a motion under Mil. R. Evid. 412 for prior sexual acts in the SUV to which the semen-stained towel could be linked, the panel was left only with evidence that the towel was used on 18 July, which corroborated the victim's narrative that a sexual act had occurred that night.

Evidence of the victim's consent to sex memorialized in the "sexts" on 17 and 18 July would have been admissible under either Mil. R. Evid. 412(b)(2) or (b)(3)

---

[13] We question whether evidence of prior consensual sexual acts would have opened the door to other uncharged misconduct, e.g., appellant's non-consensual recording of the victim engaging in sexual behaviors with him. At the very least, attempts to do so would have prompted litigation, subject to the various rules of evidence, including Mil. R. Evid. 403 considerations.

for many of the same reasons noted above. Evidence that the victim was "as horny" as appellant and intended to "f*** [him] at the gate" (i.e., immediately upon his return from the field), which were omitted from PE 1 and 2, was relevant and necessary to appellant's defense, both as circumstantial evidence of actual consent and direct evidence of appellant's mistake of fact as to consent. In effect, defense counsel accepted the government's theory and abandoned viable defense evidence.

Appellant and the victim's history of anal sex would have likewise been admissible under Mil. R. Evid. 412(b)(2) or (3). Defense counsel wrote they declined to pursue this evidence as the conditions under which the victim consented to anal sex were different from the charged misconduct, and as such, "[t]he Government would have argued that [appellant] knew that the [victim] would not consent to anal sex in the car, which was in fact the case in the text messages, and which probably was the case in the car on the night of the incident."[14] This statement is doubly concerning: first, it is directly contradicted by the same text messages where the victim seemingly *agreed* to anal sex either in the SUV or on the beach; second, it casts doubt as to whether counsel's beliefs of appellant's case impacted their advocacy. The victim's statements in the text messages on 17 and 18 July are some evidence that the victim was willing to engage in the exact sexual activity the appellant described in the admitted texts.

Lastly, our finding of deficient performance is supported by trial defense counsel's failure to adapt to the case as it progressed. In addition to failing to object to the form of the government's Mil. R. Evid. 404(b) evidence at trial, the defense rigidly clung to the factual world proposed by the government, even when questions by the panel indicated concern about the victim's and appellant's prior sexual relationship. The Manual for Courts-Martial provided multiple avenues for the defense. Counsel could have: (1) during trial, filed a late Mil. R. Evid. 412 motion based on panel member questioning;[15] (2) objected to the introduction of PEs 1 and 2 under Mil. R. Evid. 403 for misleading the members and because the government did not comply with Mil. R. Evid. 412; and (3) sought to introduce additional text

---

[14] Per CPT MD's 1 May 2023 MFR. While these distinctions may have precluded a preliminary determination of admissibility under Mil. R. Evid. 412(b)(2), it would have had little impact on a theory of admissibility under subsection (b)(3). The remainder of defense counsel's concerns we find goes to the weight of the evidence, not its admissibility.

[15] Generally, motions under Mil. R. Evid. 412 are typically due "at least 5 days prior to entry of pleas," however, subsection (c)(1) allows for filing during trial, "for good cause shown." Regardless of whether counsel would have been successful, their doing so would have reflected competence in the law and would have been relevant for our consideration of deficient performance.

messages via the rule for completeness under Mil. R. Evid. 106.[16] Instead of trying to pivot, counsel did little to defend against the government's case, despite knowing "[t]hose texts were probably the most that the panel would 'hear' from [appellant]." This further undermines the reasonableness of counsel's decisions.

The Mil. R. Evid. 412 evidence of prior consensual sex at or near the airfield in the victim's SUV and prior consensual anal sex was highly relevant to both whether the victim consented to the sexual conduct in question, and separately, whether appellant reasonably believed she consented to the same conduct on 18 July. Without this important context, the defense was "forced to start mid-sentence." *E.g.,* *United States v. Gaddy*, ARMY 20150227, 2017 CCA LEXIS 179, at *5 (Army Ct. Crim. App. 20 Mar. 2017) (summ. disp.). Appellant has met his burden to show a reasonable probability that such evidence would have been deemed admissible if offered at trial and that trial defense counsel are unable to reasonably explain their justifications for their actions.

CPT MD and CPT AT were also deficient in failing to request expert assistance. "It can be assumed that in some cases counsel would be deemed ineffective for failing to consult or rely on experts." *Harrington v. Richter*, 562 U.S. 86, 106 (2011). This is such a case.

"[T]he failure to seek expert assistance, or to call an expert already made available, are treated more like a failure to investigate . . . in determining if the appellant has met his threshold burden to demonstrate ineffective assistance." *United States v. Clark*, 55 M.J. 555, 560-61 (Army Ct. Crim. App. 2001) (internal citations omitted). Ordinarily, "[d]efense counsel must perform a reasonable investigation, or make a reasonable decision that an avenue of investigation is unnecessary." *United States v. Osheskie*, 63 M.J. 432, 435 (C.A.A.F. 2006) (internal citations omitted). If "[t]he decision not to investigate further was reasonably made," there is no deficient performance. *Id.* at 436.

Pervasive throughout the victim's testimony was evidence of her alleged intoxication and impaired memory before and during the assault. The victim also said she "blacked out" during the night of 18 July due to her consumption of alcohol. Although the government offered evidence that a witness did not think the victim should drive, the victim's level of intoxication and the effects thereof was

---

[16] Upon a party introducing "all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part – or any other writing or recorded statement – that in fairness ought to be considered at the same time." Mil. R. Evid. 106. The rule of completeness is still subject to admissibility review under Mil. R. Evid. 412. *See e.g., United States v. Schelmetty*, ARMY 20150488, 2017 CCA LEXIS 445, at *12 (Army Ct. Crim. App. 30 June 2017) (mem. op.).

largely self-reported. Based on the information available to counsel during pretrial proceedings, there was ample evidence to both justify a request for expert assistance, and for such a request to have been granted by the convening authority to support either a consent or mistake of fact as to consent theory.

Defense counsel seeks to explain their forgoing an expert on the grounds that evidence regarding memory loss or altered perception was inconsistent with their strategy of actual consent or mistake of fact as to consent. That does not make sense. A toxicologist or a psychologist, familiar with the effects on alcohol and its impact on memory formation could have laid the testimonial background for multiple potential arguments, including that the victim manifested signs of consent to appellant after arriving at the airfield, prior to any sexual acts occurring, but then was unable to remember due to her state of intoxication. Or, alternatively, based on what the victim reported drinking, that one either would or would not expect memory to be impacted in the way she described events, thus challenging her in-court veracity. When considered alongside the forgone Mil. R. Evid. 412 evidence of prior consensual sexual activity in the SUV at that distinct location, such evidence would have greatly buttressed a defense of actual consent.

Defense counsel also wrote that they could "adopt the Government expert witness[] instead of getting [their] own" for this purpose. This is not objectively reasonable. Experts are frequently employed in cases where alcohol is involved, both to educate counsel in preparation for trial and to testify as witnesses—*something counsel cannot do*. Defense knew the government was prepared to offer expert testimony at trial and defense did not reasonably prepare to combat it either through an expert-assisted cross examination or by calling their own expert to rebut the government's expert testimony. Further, as CPT AT noted in his affidavit—"if the Government decided not to call their expert[], [the defense] would have no one to call" to advance a theory of mistake of fact as to consent at all.[17] Under these circumstances, counsel's decision to exclude all but a narrow avenue of approach was deficient.

Having made such determinations, we next turn to whether appellant was prejudiced by his counsel's deficient performance.

---

[17] We pause to note, based on the affidavits submitted by counsel, CPT AT "was concerned by the decision not to use experts" and believed a toxicologist or psychologist would have been beneficial, potentially both as an expert consultant and expert witness, but deferred to CPT MD as lead counsel. While we recognize, as a matter of practice, one counsel is typically more involved in a case throughout its duration, we note ineffective assistance of counsel does not allow for analysis of individual counsel. In such situations, where there is such a stark difference in approach on a routine issue, counsel should seek additional guidance.

### 2. Prejudice

We ultimately find appellant was prejudiced. Through their failure to file a Mil. R. Evid. 412 and to seek expert assistance, the defense counsel unreasonably limited their ability to rebut the government's case. "Prejudice is established by 'showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.'" *Soler*, 2022 CCA LEXIS 268, at *6 (citing *Strickland*, 466 U.S. at 687). In other words, appellant must show "'a reasonable probability that, but for counsel's [deficient performance] the result of the proceeding would have been different.'" *Captain*, 75 M.J. at 103 (citing *Strickland*, 466 U.S. at 694) (alterations in original).

As often is the case in sexual assault cases, there were "no other percipient witnesses[] as it pertained to the events that unfolded on the day of the alleged assault." *United States v. Parler*, ARMY 20220135, 2023 CCA LEXIS 442, at *19 (Army Ct. Crim. App. 12 Oct. 2023) (mem. op.). Defense counsel's errors prevented the factfinder from being told a more complete, legally permissible story and ultimately paved the way for the government to argue: "we're expected to believe that all of a sudden [the victim's] down to have sex and anal sex in a car? That doesn't make sense."[18]

Trial defense counsel's failure to file a Mil. R. Evid. 412 motion undermined their theory, to the prejudice of appellant. First, defense planned on calling the DNA examiner, knowing that semen was found on a towel in the victim's SUV. Because of their failure to seek admission of appellant and the victim's past sexual activity in the SUV, counsel was unable to argue that the semen-stained towel originated from a prior consensual act. Given that appellant did not testify, the DNA evidence, without the Mil. R. Evid. 412 evidence, only served to corroborate the victim's narrative of a nonconsensual sexual act occurring in the vehicle. Second, defense could not argue the prior consensual anal sex, coupled with the texts agreeing to anal sex on 18 July, was evidence of or reasonably led to appellant's mistake of fact as to consent.

Next, the defense was unable to effectively address how the victim's intoxication impacted her credibility. Despite the case being charged under a lack of consent theory, the victim's intoxication played a key role in the presentation of evidence and government argument. As the defense had not requested an expert

---

[18] Trial counsel made this argument during closing. Appellant raised prosecutorial misconduct as an assigned error in this case, but our resolution of the case on other grounds moots this claim. Nonetheless, we are concerned by the trial counsel's argument – considering the trial counsel clearly knew vaginal sex in the victim's SUV, at a minimum, was not "all of a sudden," based on communications between the victim and appellant.

witness, they were unable to introduce any scientific evidence that could have challenged either what happened in the vehicle prior to a sexual act occurring (i.e., the victim could have consented, but was unable to form memories), or what appellant reasonably believed had happened (i.e., the victim manifested signs of consent in an intoxicated state). Given that the only two people in the SUV at the time of the assault were the victim, who claimed she could not remember many details, and appellant, this information was vital to appellant receiving a full and fair trial.

Trial defense counsel were ineffective in both failing to move for evidence under Mil. R. Evid. 412 and in failing to seek expert assistance. As such, appellant was prejudiced jointly and severally and we must set aside the findings and sentence.

### B. Other Errors in Appellant's Trial

Though we provide relief based on appellant's claim of ineffective assistance of counsel, we note one other issue—now moot—that warrants brief discussion: the military judges' gatekeeping responsibilities in sexual offense cases when confronted with evidence covered by Mil. R. Evid. 412.

While commonly referred to as the "rape shield" rule, Mil. R. Evid. 412—providing for a victim's right to be present and heard—is nonetheless a rule of relevance applicable to sexual offense cases. The rule allows for admission of this evidence when a victim's sexual behavior or sexual predisposition is relevant to demonstrate actual consent or mistake of fact as to consent. One feature of Mil. R. Evid. 412 that distinguishes it from other rules of relevance is the procedural requirements placed upon the military judge. While Mil. R. Evid. 103 generally discusses a military judge's role in ensuring inadmissible evidence is not "suggested" to the members to whatever extent practicable, Mil. R. Evid. 412 explicitly requires the military judge to conduct a closed hearing, outside the presence of the members before admitting it.[19]

---

[19] The military judge holds the awesome responsibility of "serv[ing] as gatekeeper deciding first whether . . . evidence is relevant and then whether it is otherwise competent, which is to say, admissible." *United States v. Roberts*, 69 M.J. 23, 27 (C.A.A.F. 2010) (discussing the military judge's gatekeeping function as pertaining to Mil. R. Evid. 412); *see also* Rule for Courts-Martial 801(a)(3)-(5) (noting that the military judge's responsibilities as the "presiding officer in a court-martial" include: "exercis[ing] reasonable control over the proceedings;" "[r]ul[ing] on all interlocutory questions and all questions of law;" and "[i]nstruct[ing] the members on questions of law and procedure").

Appellant's case was littered by the admission of evidence covered by Mil. R. Evid. 412 without a closed hearing or the rigors of examination required by the rule. While appellant's trial defense counsel and the government both contributed to this problem, the military judge, in a panel case, is ultimately responsible for allowing the evidence and instructing the panel on any attendant limitations.

## CONCLUSION

The findings of guilty and the sentence are SET ASIDE. A rehearing is authorized.

Senior Judge FLEMING concurs.

Judge PENLAND, concurring.

I fully concur with Judge Schlack's detailed approach, analysis, and decision. I write separately to mention two additional episodes of deficient trial advocacy. My intent is not to "pile on," but to succinctly encourage counsel not to repeat them.

First, the defense counsel's opening statement began with a quote from a centuries-old play. It does not bear repeating, and I am confident that I am not alone in recognizing its misogyny. The quote was inappropriate and – it follows – categorically unhelpful.

Second, the defense counsel's *closing argument* featured, for the first time in this trial, a demonstration by the appellant along with dialogue with counsel. The government predictably objected, and the judge predictably sustained the objection with a curative instruction. The law authorizes a military accused to bring information to the factfinder's attention in multiple ways, but this method was clearly not among them. To make matters worse, it raised the not unreasonable prospect – for the factfinder's consideration – that the defense did not know how to try the case.

FOR THE COURT:



// JAMES W. HERRING, JR. //
Clerk of Court